MARINA INDUSTRIAL, INC., demandante y apelada, *v.* BROWN BOVERI CORPORATION, demandada y apelante.

*Número:* O-80-354 *Resuelto:* 18 de marzo de 1983

*Alberto J. Picó González,* de *Brown, Newsom & Córdova,* abogado de la apelante; *F. Castro Amy,* abogado de la apelada.

EL JUEZ ASOCIADO SEÑOR TORRES RIGUAL emitió la opinión del Tribunal.

La novación que languidecía en el Código Civil como uno de los institutos de más antiguo abolengo en el Derecho de obligaciones surge ahora con renovada vitalidad al socaire de la ley que reglamenta la terminación de los contratos de distribución en Puerto Rico.[1] Ley Núm. 75 de 24 de junio

---

[1] Desde el comienzo del siglo hasta el día de hoy tan solo en tres casos este

de 1964 (10 L.P.R.A. sec. 278 *et seq.*). Desde nuestra decisión en *Warner Lambert Co.* v. *Tribunal Superior*, 101 D.P.R. 378 (1973), su eficacia como modo extintor, a la vez que creador de obligaciones, se reclama constantemente bajo diversos supuestos de hecho en casi todos los casos instados bajo dicha ley. *E.g.*, *G. & J., Inc.* v. *Doré Rice Mill, Inc.*, 108 D.P.R. 89 (1978); *J. Soler Motors* v. *Kaiser Jeep Int'l*, 108 D.P.R. 134 (1978); y *King Seely Thermos Co.* v. *Ernesto F. Rodríguez, Inc.*, 385 F.Supp. 894 (1974). El caso de autos no es, por tanto, excepción al reclamo de los distribuidores.

Procederemos a discutir primeramente el planteamiento sobre la novación, para luego considerar el debate de las partes sobre la procedencia en el caso de autos de los remedios estatuidos en la mencionada Ley Núm. 75 y su validez constitucional.

I

Las relaciones entre las partes se iniciaron en el año 1954, cuando la apelante Brown Boveri otorgó a Marina Electrical Supplies, Inc., antecesora de la apelada Marina Industrial, Inc., la representación exclusiva de sus productos en el territorio de Puerto Rico, República Dominicana y Haití. Durante la década del 1950 dicho contrato sufrió algunas modificaciones incidentales que fueron posteriormente recogidas en otro contrato de distribución otorgado en el 1960. Éste, a su vez, tuvo modificaciones en el transcurso del decenio, que no alteraron fundamentalmente la relación entre las partes. En junio de 1969 Marina Electrical Supplies, Inc. se consolidó con Juan Marina García, Inc. y Sucesores de Trujillo y Subiñá, creándose una nueva corporación con el nombre actual de Marina Industrial, Inc. Brown Boveri le otorgó en julio de 1970 la distribución exclusiva de sus productos mediante un nuevo contrato,

Tribunal ha aplicado la novación extintiva, a saber: *Miranda Soto* v. *Mena Eró*, 109 D.P.R. 473 (1980); *Cámara Insular, Etc.* v. *Santiago Lavandero*, 83 D.P.R. 596 (1961); y *Manrique* v. *Mangual et al.*, 28 D.P.R. 39 (1920).

cuyos términos recogieron las modificaciones acordadas por las partes durante el decenio, más otros cambios que oportunamente consideraremos.

Brown Boveri Corporation dio por terminadas las relaciones de distribución en el 1973, a los tres años de estar en vigor el contrato. Por tal motivo, Marina Industrial, Inc. instó una reclamación de daños por la terminación unilateral del contrato al amparo de la referida Ley Núm. 75.

Conforme lo resuelto en *Warner Lambert Co.*, ante, la Ley Núm. 75 no sería de aplicación al presente caso, a menos que las relaciones contractuales que comenzaron en el 1954 hubiesen sido extinguidas por el contrato de 1970. En efecto, el tribunal de instancia concluyó que, en orden a la cláusula 16 de este contrato, que expresamente revocó y anuló todos los acuerdos anteriores, las partes habían convenido una nueva relación que extinguió las anteriores y, en consecuencia, declaró con lugar la demanda y condenó a Brown Boveri Corp. a pagar a la apelada Marina Industrial, Inc. la cantidad de $18,141 por concepto de daños causados por la terminación unilateral sin justa causa, más $1,500 de honorarios de abogado.

Brown Boveri Corporation apeló de esta sentencia señalando como errores que: 1) la Ley Núm. 75 es inconstitucional, 2) no se admitió prueba sobre la intención de las partes al otorgar el contrato de 1970, para probar la ausencia de novación extintiva, 3) la evidencia admitida no estableció la novación extintiva, 4) el tribunal concluyera que la evidencia no constituyó justa causa para que la apelante terminara la relación contractual, y 5) la imposición de honorarios de abogado.

## II

Tiene primacía en el orden de la discusión el planteamiento relativo a la novación extintiva que gira esencialmente en torno al alcance y efecto de la cláusula 16 en las relaciones contractuales de las partes.

■ A. El tribunal de instancia, fundándose en la norma de exclusión de prueba extrínseca estatuida en la Regla 69(2) de Evidencia de 1979, 32 L.P.R.A. Ap. IV, R. 69(2), no admitió los documentos marcados identificación de la demandada 1 al 11, ofrecidos en el juicio por la apelante para demostrar la intención de las partes al acordar la referida cláusula. Esto es motivo del segundo señalamiento de error que no tiene, a nuestro juicio, importancia pues, como veremos más adelante, no alteran en forma alguna las determinaciones de la sentencia recurrida. Recuérdese que estamos en un área sustantiva de nuestro ordenamiento que propiamente se rige por los Arts. 1233 y 1234 del Código Civil, (²) 31 L.P.R.A. secs. 3471 y 3472, y no por el derecho probatorio. *Chaves* v. *Coop. de Crédito de Isabela,* 103 D.P.R. 892, 894 (1975). En efecto, la norma esencial sobre interpretación de contratos quedó expuesta en *Merle* v. *West Bend Co.,* 97 D.P.R. 403, 409–410 (1969):

> La intención de las partes es el criterio fundamental dispuesto en el Código Civil para fijar el alcance de las obligaciones contractuales. Es tan fundamental este criterio de intención en la interpretación de los contratos que el Código proclama su supremacía al disponer que la intención evidente de las partes prevalecerá sobre las palabras, aun cuando éstas parecieren contrarias a aquélla. Art. 1233 Código Civil, 31 L.P.R.A. sec. 3471. La intención puede demostrarse por todos los medios; no sólo por los actos coetáneos y posteriores al contrato, según parece indicar a primera vista el Art. 1234 Código Civil, 31 L.P.R.A. sec. 3472, sino también por los actos anteriores, *Hoffman* v. *Cuadrado,* 14 D.P.R. 590 (1908); así como por otras circunstancias indicativas de la voluntad de las partes. [Citas omitidas.] Puig Brutau propugna juiciosa-

---

(²) Dichos artículos disponen:

Sec. 3471. "Si los términos de un contrato son claros y no dejan duda sobre la intención de los contratantes, se estará al sentido literal de sus cláusulas.

"Si las palabras parecieren contrarias a la intención evidente de los contratantes, prevalecerá ésta sobre aquéllas."

Sec. 3472. "Para juzgar de la intención de los contratantes, deberá atenderse principalmente a los actos de éstos, coetáneos y posteriores al contrato."

mente la tesis de que el juzgador debe examinar, no sólo los actos anteriores, coetáneos o posteriores al otorgamiento del contrato, sino todas las demás circunstancias concurrentes, aunque estime que las partes se hayan expresado en términos claros. (Escolio omitido.)

■ Posteriormente, en *Coop. La Sagrada Familia* v. *Castillo*, 107 D.P.R. 405, 417 (1978), reafirmamos esta norma de interpretación que sabiamente permite al juzgador examinar todas las circunstancias concurrentes al otorgamiento del contrato para adjudicar la intención de las partes.[3] Por tales razones hemos examinado toda la prueba que obra en autos para considerar los méritos del planteamiento sobre el efecto y alcance de la cláusula 16. Dicha cláusula dispone:

This Agreement contains the entire Agreement between the parties with respect to the subject matter hereof, superseding and annulling any Agreements heretofore entered into by and between the parties.

La propia apelante admite en su alegato que el texto de esta cláusula por sus propios términos parece extinguir las relaciones contractuales anteriores. No obstante, arguye que no hubo tal intención, pues dicha cláusula solo constituye un tipo estereotipado que frecuentemente se utiliza en el Derecho común norteamericano. Por tal razón, la considera innecesaria e ineficaz para revelar la intención de las partes.

En primer término, debemos consignar que la prueba excluida por el tribunal de instancia en nada contradice lo

---

[3] En los comentarios a la Regla 69(2) del Comité Consultivo de las Reglas de Evidencia y del Secretariado de la Conferencia Judicial se expresó al respecto:

"Originalmente el Tribunal Supremo sometió a la Asamblea Legislativa las Reglas de Evidencia sin incorporar la regla de la evidencia oral, o *parole evidence rule*, por considerar que la misma es un principio de derecho sustantivo en materia de obligaciones y contratos y no un principio procesal de derecho probatorio que debe ser incorporado a las Reglas de Evidencia. Véase *Chaves* v. *Coop. de Crédito de Isabela*, 103 D.P.R. 893 (1975). No obstante, lo anterior fue modificado por la Asamblea Legislativa al añadir esta norma a la Regla 69." *P.P.P.*, Vol. I, Evidencia, pág. 79.

acordado en la referida cláusula. Basta reproducir del propio alegato de la apelante el contenido de dicha prueba para demostrar que no es inconciliable con los términos expresados en aquélla. Copiamos de la página 5 de dicho alegato:

El testimonio oral explicaría que la demandada tenía una política uniforme hacia todos sus representantes, (incluyendo la demandante). Periódicamente surgían modificaciones a los acuerdos escritos consistentes en variaciones de comisiones o la sustitución de un producto por otro nuevo. Al irse acumulando estas modificaciones con el tiempo, el trabajo clerical de la demandada se complicaba al procesar las distintas órdenes de los representantes. Por tal motivo, la demandada al pasar un período de tiempo incorporaba las modificaciones ocurridas en un nuevo acuerdo escrito, que le facilitaba el trabajo clerical. De ahí surgieron los acuerdos de 1960 y 1970 con todos los representantes de la demandada.

Los documentos ofrecidos y no admitidos en evidencia tampoco desvirtúan la intención expresada en los términos de dicha cláusula. Nos remitimos a las páginas 6 y 7 del Memorando de la apelante al tribunal de instancia fechado el 4 de enero de 1980, en el cual se explica el alcance de dicha prueba. (⁴)

---

(⁴) En ese Memorando la apelante explica de la siguiente forma el contenido de dichos documentos:

"De haberse permitido la evidencia ofrecida por la demandada dirigida a probar la ausencia de novación, el señor Stauffer hubiera declarado lo siguiente en cuanto a la prueba documental no admitida:

"1. Identificación 1. Este documento fechado 24 de noviembre de 1954 y dirigido a la atención del Sr. B.M. Muñoz, marca el establecimiento de la relación contractual entre las partes y es básicamente el mismo documento que tenía Brown Boveri con todos sus representantes en aquella época.

"2. Identificación 2. Este documento fechado 30 de septiembre de 1959 está dirigido a todos los representantes de Brown Boveri y les propone ciertos pequeños cambios en cuanto a piezas de repuesto.

"3. Identificación 3. Este documento fechado primero de octubre de 1959 está dirigido a todos los representantes y sugiere ciertos cambios en comisiones.

"4. Identificación 4. Este documento fechado 7 de marzo de 1960 est[á] dirigido a todos los representantes y les remite un contrato que refleja los pequeños cambios y modificaciones que a través de los años habían sido efectuados. Este documento no varía básicamente la relación contractual existente previamente. Es

■ En segundo término, el texto claro y preciso de la referida cláusula no deja dudas de la intención de las partes: establece una nueva relación jurídica y diáfanamente revoca y anula la anterior. El mandato estricto del citado Art. 1233 nos obliga a atenernos al sentido literal de los términos del contrato cuando, como en este caso, no dejan dudas de la intención de los contratantes. El argumento de la apelante que niega eficacia a dicha cláusula es, por tanto, inadmisible.

B. La apelante también arguye para sostener la inaplicabilidad de la Ley Núm. 75 que la mera expresión por las partes de que están extinguiendo una previa relación no produce una novación extintiva si la supuesta nueva relación en nada varía la naturaleza de la relación contrac-

---

básicamente idéntico al documento contrato de 1954 y al documento contrato de 1970. La razón básica para la preparación del nuevo documento contrato es facilitar las operaciones internas en las oficinas de Brown Boveri al tramitar las órdenes de sus representantes a tenor con los cambios periódicos en comisiones que habían ocurrido a través de los años.

"5. Identificación 5. Este documento consiste de [*sic*] una carta de fecha 22 de marzo de 1960 dirigida por el Sr. B.M. Muñoz a Brown Boveri devolviendo firmado [*sic*] la copia del nuevo documento contrato, indicando cambios habidos en las otras líneas representadas por Marina.

"6. Identificación 6. Este es el documento contrato firmado por Marina el 22 de marzo de 1960.

"7. Identificación 7. Este documento consiste de [*sic*] una carta de Brown Boveri al señor Muñoz con fecha de 26 de mayo de 1960, acusando recibo del documento anterior.

"8. Identificación 8. Este documento consiste de [*sic*] una carta dirigida a todos los representantes de Brown Boveri, con fecha de 28 de diciembre de 1961 sugiriendo un cambio en comisiones en cuanto a piezas de respuesto [*sic*]. El documento aparece aceptado por B.M. Muñoz el 23 de abril de 1962.

"9. Identificación 9. Este documento consiste en una carta con fecha de 26 de abril de 1962 dirig[i]da por el señor B.M. Muñoz a la demandada remitiendo el documento mencionado en el párrafo que antecede.

"10. Identificaciones 10 y 11. Estos documentos se refieren a otro cambio menor en el contrato de representación entre las partes. La demandada le comunicó a todos sus representantes del cambio sugerido el 10 de diciembre de 1963, y el señor Muñoz ratificó la aceptación de la demandante a los cambios, el 7 de enero de 1964."

tual previa. Apoya su argumento en la siguiente cita de Albaladejo, repetida por Puig Brutau y Manresa: (5)

Mas, las partes, si ciertamente son dueñas de construir un caso concreto —que objetivamente permita la elección— bien como extinción de una obligación y nacimiento de otra, bien como modificación de obligación, sin embargo, de lo que no son dueñas —*porque iría contra la naturaleza de las cosas*— es de: 1.° Realizar una novación extintiva en un caso en el que el cambio que se establezca sea tan exiguo que objetivamente excluya la posibilidad de pensar que se está frente a otra obligación (pues es sólo la anterior con un ligero retoque). 2.° Establecer una novación modificativa cuando la antigua obligación y la nueva sean de todo punto incompatibles; pues, entonces, la naturaleza de las cosas (además, art. 1.204, *in fine*), implica novación extintiva, y lo único que las partes pueden hacer, si no quieren extinción, es llevar a cabo un cambio menos trascendental. (Escolio omitido y énfasis suplido.) *Derecho Civil*, 5ta ed., Barcelona, Ed. Bosch, 1980, T. II, Vol. I, pág. 326.

■ Nada tenemos que objetar al criterio de tan ilustres maestros, salvo las consideraciones que apuntamos a continuación. Ciertamente nos parece extraño que pueda efec-

---

(5) Puig Brutau expresa su criterio en los siguientes términos:

"Las partes pueden elegir entre limitarse a modificar una obligación o proceder a extinguirla para que otra la sustituya. Pero en ambos casos han de tener en cuenta que *no pueden forzar la naturaleza de las cosas*. Como dice Albaladejo, el caso concreto de que se trate ha de permitir objetivamente la elección. Aunque manifiesten lo contrario, la novación no será extintiva cuando se limiten a introducir una variación tan insignificante que no puede pensarse que se trata de otra obligación. Si pretendieran que se ha limitado a una modificación, no podría entenderse de este modo cuando la antigua obligación y la nueva fueran de todo punto incompatibles." (Énfasis nuestro.) *Fundamentos de Derecho Civil*, 2da ed., Barcelona, Ed. Bosch, 1976, T.I, Vol. 2, pág. 462.

Igualmente Manresa se expresa así:

"Cuando siendo la novación objetiva se la declare expresamente y aún se la dé ese nombre, pero, sin embargo, no consista la modificación ni en el objeto ni en las condiciones principales, requisitos exigidos en el artículo precedente, no habrá verdadera y eficaz novación, puesto que *los contratantes no pueden variar la naturaleza jurídica de los actos*. Esto no es negar la validez de esas pequeñas modificaciones, pero sí su carácter de novación, según ya se indicó al comentar el artículo anterior." (Énfasis nuestro.) *Comentarios al Código Civil*, 6ta ed., Madrid, Ed. Reus, T. 8, Vol. I, pág. 875.

tuarse una novación extintiva cuando las partes tan solo se limitan a reproducir la misma obligación con algún cambio insignificante. Tal supuesto generalmente indica un reconocimiento de la obligación, no importa que las partes manifiesten lo contrario. F. de A. Sancho Rebullida, *La Novación de la Obligaciones*, Barcelona, Ed. Nauta, 1964, pág. 358; Albaladejo, *op. cit.*, supra, pág. 317; D. Espín Cánovas, *Manual de Derecho Civil*, 4ta ed., Madrid, Ed. Revista de Derecho Privado, 1975, Vol. III, pág. 155; A. Díaz Pairó, *Teoría General de las Obligaciones*, 3ra ed. rev., La Habana, Ed. Lex, 1954, Vol. II, pág. 132; M. Albaladejo, *Comentarios al Código Civil y compilaciones forales*, Madrid, Ed. Revista de Derecho Privado, 1980, T. XVI, Vol. 1, pág. 2.

■ La novación siempre requiere alguna discrepancia entre la nueva y la antigua obligación, lo que la doctrina conoce como el *aliquid novi*, es decir, un elemento nuevo. Véanse, entre otros, Albaladejo, *op. cit.*, pág. 317; Díaz Pairó, *op. cit.*, pág. 132; P. J. Azurza, *Nota sobre Novación*, 34 Rev. Der. Privado 604 (1950). Mazeaud nos recuerda, y no vanamente, que la novación toma su nombre de "nuevo". *Lecciones de Derecho Civil*, Buenos Aires, Eds. Jurídicas Europa-América, 1960, T. III, Parte II, pág. 463.

No obstante, la declaración terminante de las partes que expresan el *animus novandi* puede tener consecuencias jurídicas, pues bien se sabe que la voluntad generalmente es fuente creadora de obligaciones. De ahí, que algunos autores de sólida solvencia en la glosa reconozcan que si las partes han querido extinguir la obligación precedente y así lo han expresado, operará entre ellos por efecto del *animus* una novación extintiva, aunque el cambio sea exiguo; pero no tendrá tal efecto con respecto a terceros para los que meramente habría un reconocimiento de la obligación. Sancho Rebullida señala que en este supuesto no es posible que la novación opere frente a terceros, "porque la modificación de las obligaciones encuentra en el Art. 1255 C.c. a la vez que la base, el límite". *Op. cit.*, pág. 347. Sin duda es un criterio persuasivo que merece consideración.

No faltan autores que con igual solvencia sostengan que basta la declaración expresa de las partes para que opere una novación extintiva sin más, aunque medien solo cambios exiguos.(6) Así nos dice Scaevola:

> Por de pronto, la declaración terminante de las partes no deja lugar a duda. Si los interesados revocan expresamente lo que pactaron en un principio, la novación queda establecida en su totalidad, aunque resulte de hecho que las diferencias entre la obligación antigua y la nueva son insignificantes. *Código Civil*, 2da ed., Madrid, Ed. Reus, 1957, T. XIX, pág. 1109.

Lozado Berruezo reafirma este criterio puntualizando el efecto generador de la voluntad:

> Insisto —nos dice— en que, en todo caso, habrá de tenerse siempre en cuenta la voluntad de las partes, pues ya señalábamos antes que por más insignificante que el cambio pueda ser produciría novación si aquéllas así lo habían decidido, siempre, claro, que no atente contra los límites que a tal efecto —ir contra el orden público, buenas costumbres, etc.— señala el Código. *La extinción de las obligaciones por novación*, Barcelona, Ed. Colección Nereo, 1963, pág. 138.

Conforme esta vertiente doctrinal, no es necesario que la nueva obligación introduzca un cambio significativo si las partes han expresado claramente la voluntad de extinguir, siendo suficiente cualquier tipo de cambio para que ocurra la novación extintiva entre ellos.

En el caso de autos no es necesario, sin embargo, adherirse a ninguna de estas corrientes doctrinales, pues al concretar más adelante la exégesis a los hechos específicos del caso, veremos que bajo cualquiera de ellas llegaríamos al mismo resultado.

---

(6) Hay también una corriente intermedia que reconoce como efecto jurídico de la declaración de voluntad en este supuesto el de la prescripción. D. De Buen, *Derecho Civil Común*, Madrid, Ed. Cultural, Vol. I, pág. 494; D. Espín Cánovas, *Manual de Derecho Civil*, 4ta ed., Madrid, Ed. Revista de Derecho Privado, 1975, Vol. III, pág. 155.

## III

En efecto, a poco que se examinen los cambios introducidos por el contrato otorgado en el 1970, hemos de advertir que no son tan exiguos como para hacer inoperante la novación extintiva —cuyo *animus,* como ya vimos, fue claro y terminantemente expresado en su cláusula 16— o como para válidamente decir que dichos cambios van contra la naturaleza de la novación por ausencia del *aliquid novi,* que es a lo que se refiere el argumento de la apelante y las citas que hemos reproducido de Albadalejo, Puig Brutau y Manresa. Véanse texto y escolio 5, *ante.* Dichos cambios consisten en:

1— El contrato de 1960 fue suscrito por Brown Boveri y Marina Electrical Supplies, Inc., mientras que el del 1970 fue suscrito por Marina Industrial, Inc.

2— El contrato de 1960 proveía para la exclusiva representación por la apelada en Puerto Rico y la República Dominicana. El del 1970 extendió el territorio de presentación a Islas Vírgenes.

3— El contrato de 1960 contenía una cláusula de terminación unilateral mediante la cual las partes podían darlo por terminado con 90 días de anticipación, pero tal derecho no podía ejercerse antes del 30 de junio de 1960. El del 1970 redujo el término de notificación para la terminación unilateral a 30 días. No obstante, dispuso que el mecanismo de término unilateral no estaría disponible hasta el 30 de junio de 1973, tres años más tarde.

4— El contrato de 1970 incorporó una nueva cláusula mediante la cual el distribuidor se obligó a no hacer negocios con clientes del principal en el territorio de distribución dentro de los seis meses siguientes a la terminación del contrato.

Ciertamente, en el supuesto de una novación tácita estos cambios por sí solos no serían suficientes para producir una novación extintiva, porque no son "de todo punto incompatibles". Es decir, carecen del elemento fun-

damental de incompatibilidad absoluta requerido por el Art. 1158 del Código Civil, 31 L.P.R.A. sec. 3242.[7] *Cf. Warner Lambert Co.*, supra; *G. & J., Inc.*, supra. Pero unidos a la voluntad de extinguir, expresada en la referida cláusula 16, tienen, sin duda, plena capacidad extintiva. En consecuencia, el contrato de 1970 tuvo el efecto de extinguir la relación anterior y de crear una nueva relación entre las partes, cuya terminación cae de lleno bajo el palio de la Ley Núm. 75.

Esta conclusión nos lleva a considerar los planteamientos relativos a la validez constitucional de dicha ley.

## IV

La Ley Núm. 75 crea una causa de acción a favor del distribuidor cuando el principal da por terminado el contrato sin justa causa. Al respecto provee el Art. 2 de la ley:

> No empece la existencia en un contrato de distribución de una cláusula reservándole[s] a las partes el derecho unilateral a poner fin a la relación existente, ningún principal o concedente podrá dar por terminada dicha relación, o directa o indirectamente realizar acto alguno en menoscabo de la relación establecida, o negarse a renovar dicho contrato a su vencimiento normal, excepto por justa causa. 10 L.P.R.A. sec. 278a.

Las objeciones de la apelante a la validez constitucional de esta disposición se fundan en las garantías del debido proceso de ley y de la igual protección de las leyes, preceptuadas en el Art. II, Sec. 7 de la Constitución del Estado Libre Asociado de Puerto Rico[8] y en la prohibición conte-

---

[7] El Art. 1158 dispone:

"Para que una obligación quede extinguida por otra que la substituya, es preciso que así se declare terminantemente, o que la antigua y la nueva sean de todo punto incompatibles."

[8] "Se reconoce como derecho fundamental del ser humano el derecho a la vida, a la libertad y al disfrute de la propiedad. . . . Ninguna persona será privada de su libertad o propiedad sin debido proceso de ley, ni se negará a persona alguna

nida en el Art. II, Sec. 9 de dicha Constitución, al efecto de que la propiedad privada no se tomará ni perjudicará para uso público sin una justa compensación. Su posición se reduce a conte⁓der que la mencionada disposición establece un trato desigual y una restricción unilateral a la libre contratación, porque permite al distribuidor dar por terminado el contrato a su vencimiento, mientras que prohíbe al principal hacer lo mismo, excepto por justa causa sin que, a su juicio, exista "una justificación clara para la legislatura intervenir con contratos que las partes quieran llevar a cabo, ni para discriminar entre una y otra parte en un contrato comercial". Debemos aclarar que la apelante sometió este planteamiento por los argumentos que muy esquemáticamente expuso en el alegato presentado en *Pan Ame. Comp. Corp.* v. *Data Gen. Corp.*, 112 D.P.R. 780 (1982), que se refiere a preguntas certificadas por la Corte de Distrito de los Estados Unidos para el Distrito de Puerto Rico sobre diversos aspectos relacionados con la validez de la Ley Núm. 75. [9] No obstante, abordamos la cuestión conscientes del gran interés público que la misma reviste.

En dicho alegato la apelante descansa esencialmente su ataque a la validez constitucional de la Ley Núm. 75 en expresiones que hicimos en *Warner Lambert Co.*, supra, en el contexto de un planteamiento de inconstitucionalidad por la aplicación retroactiva de dicha ley. Nada de lo que allí dijimos puede tener aplicación en la consideración de la validez del estatuto en su aplicación prospectiva. En efecto, en *Warner Lambert Co.*, supra, pág. 399, tuvimos sumo cuidado en reservar nuestras expresiones a la validez del estatuto en su aplicación retroactiva:

---

en Puerto Rico la igual protección de las leyes. No se aprobarán leyes que menoscaben las obligaciones contractuales."

[9] En dicho caso formulamos las normas que gobiernan la contestación de preguntas por este Tribunal bajo el procedimiento de certificación establecido en la Regla 53.1(c) de Procedimiento Civil y la Núm. 27 del Reglamento de este Tribunal.

Aclaramos . . . que todas las anteriores consideraciones se refieren a la validez de la aplicación retroactiva de la Ley Núm. 75 que en nada prejuzgan la facultad legislativa para reglamentar los contratos de distribución en forma prospectiva. La Asamblea Legislativa tiene amplios poderes para reglamentar prácticas que considere perjudiciales al sistema de mercadeo, salvo que al hacerlo infrinja una disposición específica de la Constitución, como se infrinje en el caso de autos la cláusula contra el menoscabo de las obligaciones contractuales.

■ Y es que el proceso analítico en uno y otro caso se gobierna por criterios jurídicos distintos. La aplicación retroactiva de un estatuto puede quebrantar la garantía contra el menoscabo de las obligaciones contractuales cuyo fundamento racional lo constituye la certeza y estabilidad de estas relaciones. Constituyen, sin duda, valores apreciables en nuestro ordenamiento que solo pueden quedar subordinados al poder de razón de estado cuando existan razones superiores de orden público. *Sierra, Comisionado* v. *San Miguel,* 70 D.P.R. 604 (1949); *cf. El Paso* v. *Simmons,* 379 U.S. 497, 506 (1965). Por tal razón, en *Warner Lambert Co.* adoptamos un criterio más exigente de razonabilidad constituido por la sustancialidad del interés público promovido por el estatuto en cuestión y la dimensión del menoscabo ocasionado por su aplicación retroactiva. "Mientras más grave sea el mal social que el estatuto intenta remediar —dijimos— más grande es el interés público envuelto, y, por tanto, mayor justificación para su aplicación retroactiva." Pág. 396. Consideramos allí ejemplos ilustrativos de una válida aplicación retroactiva los casos de emergencia creada, entre otras causas, por una inflación o recesión económica, por un conflicto bélico o por un desastre de la naturaleza. Todo cuanto allí expresamos gira, pues, en torno a la confrontación del poder de razón de estado con la garantía constitucional contra el menoscabo de las obligaciones contractuales. El planteamiento sobre la validez del

estatuto en su aplicación prospectiva se rige, sin embargo, por criterios menos exigentes.

■ Es bien sabido que, en el ejercicio del poder de razón de estado, la legislatura tiene una amplia facultad para la reglamentación de carácter económico sujeta únicamente a las limitaciones impuestas por la garantía del debido procedimiento de ley. *E.L.A.* v. *Márquez*, 93 D.P.R. 393 (1966); *A. Roig, Sucrs.* v. *Junta Azucarera*, 77 D.P.R. 342, 357 (1954).

■ Estas limitaciones solo requieren que la reglamentación no sea irrazonable, arbitraria o caprichosa y que el medio elegido tenga una relación real y sustancial con el objetivo que se persigue. *Morales* v. *Lizarribar*, 100 D.P.R. 717 (1972); *A. Roig, Sucrs.*, supra; *Central San Vicente* v. *Junta Azucarera*, 78 D.P.R. 799 (1955). Los tribunales han adoptado una postura deferente hacia el juicio legislativo en la aplicación de estos requisitos. Desde hace cerca de medio siglo el Tribunal Supremo de los Estados Unidos ha rechazado consistentemente ataques a la validez constitucional de estatutos, fundados en la garantía del debido procedimiento de ley. G. Gunther, *Cases & Materials on Constitutional Law*, 10ma ed., Mineola, New York, The Foundation Press, Inc., 1980, pág. 540. Dicho Tribunal ha sostenido el juicio legislativo, aun cuando no se hayan expresado los hechos que lo fundamenten, porque en tal caso se debe presumir su existencia, a menos que a la luz de los hechos probados o de los hechos que puedan ser objeto de conocimiento judicial fueran de tal naturaleza que excluyan la presunción de racionalidad que favorece el juicio legislativo. *U.S.* v. *Carolene Products Co.*, 304 U.S. 144 (1938). Por supuesto, la parte que impugna la constitucionalidad del estatuto deberá probar los hechos en que se fundan para demostrar que la reglamentación legislativa no tiene base racional. Véase, Annot., *Consideration of extrinsic evidence on question of constitutionality or unconstitutionality of statute*, 82 L. Ed. 1244 y ss. (1938). En *A. Roig, Sucrs.*, supra, pág. 356,

esc. 18, adoptamos como norma de interpretación constitucional esta postura de manos afuera citando con aprobación las afirmaciones del Juez Douglas en *Day-Brite Lighting, Inc.* v. *Missouri,* 342 U.S. 421, 423 (1952), a los efectos de que:

> Nuestras recientes decisiones prescriben claramente que esta Corte no funciona como una superlegislatura para pesar la sabiduría de la legislación o para decidir si la política que expresa está en pugna con el bienestar público. El poder legislativo tiene sus limitaciones, según resuelve el caso de *Tot* v. *United States,* 319 U.S. 463. Pero las asambleas legislativas estatales tienen autoridad constitucional para experimentar con nuevas técnicas; tienen derecho a sus propias normas de bienestar público; pueden dentro de amplísimas limitaciones controlar las prácticas en el campo obrero-patronal, mientras las prohibiciones constitucionales específicas no sean infringidas y mientras se eviten conflictos con las leyes federales válidas y predominantes.

 El análisis y los criterios bajo la cláusula del debido proceso y la igual protección de las leyes son similares salvo cuando se afectan derechos fundamentales o existan clasificaciones sospechosas. *Zachry International* v. *Tribunal Superior,* 104 D.P.R. 267 (1975). Es decir, el análisis tradicional bajo la cláusula de la igual protección de las leyes, cuando se trata de legislación de tipo económico o social, solo exige que la clasificación no sea arbitraria y que la misma pueda establecer un nexo racional con los propósitos del estatuto. *Wackenhut Corp.* v. *Rodríguez Aponte,* 100 D.P.R. 518, 531 (1972); *León Rosario* v. *Torres,* 109 D.P.R. 804 (1980); *Coca-Cola Bottling Co.* v. *Srio. de Hacienda,* 112 D.P.R. 707 (1982); *U.S. Brewers Assoc.* v. *Srio. de Hacienda,* 109 D.P.R. 456, 461 (1980). Al igual que en las impugnaciones fundadas en el debido proceso de ley, la postura judicial también es de suma deferencia al juicio legislativo en los ataques bajo la igual protección de las leyes. J. Tussman y J. tenBroek en un estudio clásico sobre el tema afirman que la ausencia de la cláusula de la igual

protección de las leyes en la Quinta Enmienda no impide que bajo el debido proceso se consideren las mismas cuestiones. *The Equal Protection of the Laws*, 37 Calif. L. Rev. 341, 363 (1949). Apuntan al respecto que en *United States* v. *Petrillo*, 332 U.S. 1 (1947), el Tribunal Supremo federal reconoció en principio que la cláusula del debido proceso de ley encierra todos los requisitos de la igual protección de las leyes sobre clasificaciones legislativas.

Un observador perspicaz del Derecho constitucional norteamericano ha dicho que tanto la garantía de la igual protección como la del debido proceso de ley en el área económica meramente significaba ". . .un escrutinio mínimo en teoría y virtualmente ninguno de hecho". (Traducción nuestra.) G. Gunther, *Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection*, 86 Harv. L. Rev. 1, 8 (1971).

Actualmente, sin embargo, se percibe en un sector del Tribunal Supremo de los Estados Unidos la inclinación hacia una postura menos complaciente en términos de requerir que los medios establecidos en el estatuto no guarden meramente una conexión racional con su propósito, sino que promuevan sustancialmente un objetivo gubernamental, real y no especulativo. Gunther, *Cases & Materials*, supra, pág. 674. En efecto, se pueden apreciar ya algunas expresiones que denotan una preocupación por cerrar la brecha con una norma de interpretación judicial más restrictiva. Tal preocupación, sin embargo, no se ha plasmado en doctrina jurisprudencial. Véase la opinión disidente del Juez Brennan y la concurrente del Juez Stevens en *U.S. Railroad Retirement Bd.* v. *Fritz*, 449 U.S. 166 (1980). Véase, además, el disenso del Juez Powell en *Schweiker* v. *Wilson*, 450 U.S. 221 (1981).

En *Fritz* el Juez Brennan clamó por un propósito legislativo real, no hipotético, como determinante de la constitucionalidad del estatuto. Al respecto afirmó en sus disenso:

Empero el criterio racional no es "uno sin dientes" [cita omitida] y no puede satisfacerse con justificaciones insubstanciales o improbables de la clasificación legislativa ofrecidas a posteriori por los abogados del Gobierno. Pág. 184.

El Juez Stevens concurrió en este enfoque:

En mi opinión la crítica del Juez Brennan al enfoque del Tribunal en este caso amerita una contestación mejor razonada que la contenida en la nota al calce 10, *ante,* a las págs. 176–177. [66 L.Ed.2d, a la pág. 377.] El Juez Brennan correctamente señala que si el análisis del propósito legislativo requiriese solamente una lectura del texto en la disposición estatutaria impugnada, y si cualquier "base concebible" para una clasificación arbitraria pudiera refutar un ataque constitucional, la revisión judicial constituiría un mero reconocimiento tautológico del hecho de que el Congreso hizo lo que intentó hacer. . . . (Traducción nuestra.) Pág. 180.

El Juez Powell ha hecho expresiones similares en *Schweiker,* supra. [10]

██ La Ley Núm. 75 cumple a cabalidad con los requisitos del debido proceso y de la igual protección de las leyes aun bajo criterios más exigentes de los que hemos adoptado en nuestra jurisdicción y aun bajo los criterios que propugnan los jueces Brennan, Stevens y Powell en los Estados Unidos.

No tenemos que especular ni concebir hipotéticamente propósitos legislativos ni hechos que sirvan de base para la aplicación del criterio de racionalidad a la clasificación entre distribuidores y principales, pues la propia Ley Núm. 75 articula con claridad, tanto en su texto como en su histo-

---

[10] En su disenso en dicho caso expresó:

"En mi parecer, el Tribunal debiera recibir con cierta desconfianza las especulaciones a posteriori acerca del propósito legislativo que no estén sostenidas por el historial. . . . Este escrutinio marginalmente más exigente hará indirectamente que se examine la plausibilidad del propósito sugerido y habrá de preservar la revisión de la igual protección de las leyes como algo más que 'un mero reconocimiento tautológico del hecho de que el Congreso hizo lo que intentó hacer'." (Traducción nuestra.) Págs. 244–245.

rial, juicios y conclusiones que demuestran la legitimidad de sus propósitos y la racionalidad de la clasificación impugnada. La Exposición de Motivos recoge adecuadamente la naturaleza del problema que requería acción legislativa:

El Estado Libre Asociado de Puerto Rico no puede permanecer indiferente al creciente número de casos en que empresas domésticas y del exterior, sin causa justificada, eliminan sus distribuidores, concesionarios, o agentes . . . tan pronto como [éstos] han creado un mercado favorable y sin tener en cuenta sus intereses legítimos.

La Asamblea Legislativa de Puerto Rico declara que la razonable estabilidad en las relaciones de distribución en Puerto Rico es vital a la economía general del país, al interés público y al bienestar general, y en el ejercicio del poder policial, considera necesario reglamentar, en lo pertinente, el campo de dichas relaciones, para evitar los abusos que ciertas prácticas ocasionan. 18 *Diario de Sesiones* 1531 (1964).

El Informe de la Comisión de Industria y Comercio del Senado expone claramente la justificación de la acción legislativa:

Recientemente se ha recrudecido el problema creado en el sistema de distribución en Puerto Rico por la acción intempestiva de empresas manufactureras domésticas y del exterior que, sin causa justificada, dan por terminadas sus relaciones con sus distribuidores y agentes en Puerto Rico, tan pronto como éstos han creado un mercado favorable para sus productos, frustrando las legítimas expectativas e intereses de los que tan eficientemente han cumplido con sus responsabilidades.

.　　.　　.　　.　　.　　.　　.　　.

Las disposiciones tradicionales que regulan los contratos entre particulares han demostrado no ser eficaces para proteger los legítimos derechos del distribuidor o agente, por lo que se hace necesario legislar para reglamentar esta relación y garantizar que los manufactureros actúen de buena fé, equitativamente, de manera no arbitraria, y preservar al distribuidor o agente los derechos y las expectativas justificadas

inherentes a la relación. Además, esto tendrá la consecuencia de dar estabilidad a las relaciones de distribución.

Esta es la grave situación que se intenta remediar con la aprobación de este proyecto. . . . *Diario de Sesiones*, supra, pág. 1531.

Como puede verse, el medio estatuido por el legislador —prohibir al principal dar por terminado el contrato de distribución sin justa causa— que a la vez constituye la clasificación legislativa impugnada por la apelante, tiene una relación real y sustancial con los propósitos articulados en la propia ley de proteger a los distribuidores de Puerto Rico contra prácticas indebidas por parte de los principales o concedentes y de nivelar las condiciones de contratación de dos grupos económicamente dispares en su fuerza, a fin de lograr una razonable estabilidad de las relaciones de distribución. *Cf. Walborg Corp.* v. *Tribunal Superior*, 104 D.P.R. 184 (1975); *San Juan Merc.* v. *Canadian Transport Co.*, 108 D.P.R. 211, 216 (1978).

No es arbitraria o irrazonable dicha clasificación en cuanto impide solamente al principal la terminación unilateral del contrato sin justa causa, ya que es él quien provoca el mal social que el legislador quiso remediar. Además, el criterio de razonabilidad es flexible y no requiere que la Asamblea Legislativa al atacar un problema económico o social provea remedios a todos los males que puedan derivarse del mismo. *Wackenhut*, supra, a la pág. 531. Ciertamente la restricción de su libertad de contratación conduce a remediar la disparidad económica de las partes y a cumplir con los propósitos articulados en el estatuto. La apelante, por otro lado, no presentó prueba alguna para demostrar que dicha clasificación fuera irrazonable en su aplicación al caso de autos. No nos compete pasar juicio sobre la sabiduría de la acción legislativa en su decisión de proteger a los distribuidores en Puerto Rico. *A. Roig, Sucrs.*, supra, pág. 357. Menos aún cuando no se ha aducido prueba sobre la ausencia de base racional en la clasificación impugnada.

■ En resumen, la Ley Núm. 75 no viola la garantía constitucional sobre el debido proceso de ley ni sobre la igual protección de las leyes y constituye, por tanto, una válida reglamentación legislativa de las relaciones contractuales de distribución en Puerto Rico.

## V

La apelante toma de nuevo como pie a *Warner Lambert Co.*, supra, para atacar la definición de justa causa estatuida en la Ley Núm. 75 en los siguientes términos:

(d) Justa causa: incumplimiento de alguna de las obligaciones esenciales del contrato de distribución, por parte del distribuidor, o cualquier acción u omisión por parte de éste que afecte adversamente y en forma sustancial los intereses del principal o concedente en el desarrollo del mercado o distribución de la mercancía o servicios.

Sostiene que esta definición limita la justa causa a actos imputables al distribuidor y no admite otros motivos que pudiera tener el principal para la terminación del contrato. Menciona entre tales motivos: a) la buena fe del principal, b) su derecho a establecer su propio sistema de distribución, c) hacer ajustes al sistema de distribución que de buena fe considere necesarios para incrementar su mercado, y d) su decisión de retirarse por completo del territorio donde ha operado.

■ La dificultad con este planteamiento es que la apelante no alega ninguno de estos motivos para la terminación del contrato, por lo que no tiene capacidad jurídica para cuestionar la validez constitucional de la definición. *E.L.A.* v. *Aguayo*, 80 D.P.R. 552 (1958).

Arguye, además, que tuvo justa causa para la terminación de las relaciones de distribución, porque el contrato especificaba que Brown Boveri podía darlo por terminado si ocurría un cambio importante en el personal de Marina Industrial, Inc. o en el control de su organización; que tal cambio ocurrió al renunciar el señor Muñoz, quien desde el

comienzo de la relación entre las partes era el contacto en Puerto Rico con la apelante. Concluye que "La renuncia del señor Muñoz tiene que ser considerada como un cambio importante en el personal de la demandante, en lo que respecta a la demandada. Después de todo, Muñoz era para la demandada su hombre clave en Puerto Rico. Muñoz era la persona con quien la demandada tenía relaciones directas por un período de veinte años".

Las determinaciones de hecho del tribunal de instancia son contrarias a la posición de la apelante. Las mismas fueron al efecto de que la relación entre las partes se llevaba a cabo a través de Bartolomé Muñoz, quien tenía a su cargo la cuenta de Brown Boveri. En julio de 1973 Muñoz fue sustituido como Presidente de la Junta de Directores y pasó a ocupar el cargo de vicepresidente de Marina Industrial, Inc.; el 30 de agosto siguiente notificó por primera vez a la empresa su decisión de renunciar al día siguiente. Ya antes, sin embargo, había dado conocimiento a Brown Boveri de su intención de renunciar en esa fecha. "Por ello —concluyó el tribunal— desde antes que él remitiera esa comunicación ya Brown Boveri había hecho su decisión de dar por terminada la relación en la representación que ostentaba Marina Industrial, lo que hizo mediante la carta de su Presidente Edward H. Stauffer del 31 de agosto de 1973, a ser efectiva el 30 de septiembre de 1973." Brown Boveri no señaló causa alguna para la terminación del contrato. En su comunicación a Marina Industrial, Inc. dio la impresión de que ignoraba la terminación de Muñoz como funcionario de dicha empresa. En noviembre de 1973 Muñoz asumió la representación de Brown Boveri en Puerto Rico.

La apelante no nos ha puesto en condiciones de revisar las anteriores determinaciones de hecho, ya que renunció a elevar la exposición narrativa parcial de la prueba que le concedimos por resolución fechada 11 de julio de 1980.

Tales conclusiones demuestran que la terminación del

contrato no se debió a incumplimiento del mismo por parte de Marina Industrial, Inc. y, por consiguiente, no hubo la justa causa que requiere el Art. 3 de la Ley Núm. 75.

## VI

Impugna la apelante la formulación de daños estatuidos en la Ley Núm. 75 porque a su juicio priva al principal de su propiedad sin el debido proceso de ley. El Art. 3 de la Ley Núm. 75 (10 L.P.R.A. sec. 278b) provee al respecto:

De no existir justa causa para la terminación del contrato de distribución, para el menoscabo de la relación establecida, o para la negativa a renovar dicho contrato, el principal habrá ejecutado un acto torticero contra el distribuidor y deberá indemnizarle en la medida de los daños que le cause, cuya cuantía se fijará a base de los siguientes factores:

(a) El valor actual de lo invertido por el distribuidor para la adquisición y la adecuación de locales, equipo, instalaciones, mobiliario y útiles, en la medida en que éstos no fueren fácil y razonablemente aprovechables para alguna otra actividad a que el distribuidor estuviere normalmente dedicado;

(b) el costo de las mercaderías, partes, piezas, accesorios y útiles que el distribuidor tenga en existencia, y de cuya venta o explotación no pueda beneficiarse;

(c) la plusvalía del negocio, o aquella parte de ésta atribuible a la distribución de la mercancía o la prestación de los servicios de que se trate, a ser determinada dicha plusvalía tomando en consideración los siguientes factores:

(1) número de años que el distribuidor ha tenido a su cargo la distribución;

(2) volumen actual de distribución de la mercancía o prestación de los servicios de que se trate y la proporción que representa en el negocio del distribuidor;

(3) proporción del mercado de Puerto Rico que dicho volumen representa;

(4) cualquier otro factor que ayude a establecer equitativamente el monto de dicha plusvalía.

(d) el monto de los beneficios que se hayan obtenido en la distribución de la mercancía o en la prestación de los servicios, según sea el caso, durante los últimos cinco años o si no

llegaren a cinco, cinco veces el promedio de los beneficios anuales obtenidos durante los últimos años, cualesquiera que fuesen.

La apelante argumenta que dicha fórmula no deja al arbitrio del juzgador la fijación de los daños a base de principios tradicionales reconocidos en nuestro derecho y que por el contrario impone los factores que se enumeran en dicho artículo. Señala que en esa forma se impide tomar en cuenta elementos tales como la obligación del distribuidor de mitigar los daños y la contribución del principal al valor que haya adquirido el negocio; que el hacer mandatoria la concesión de la plusvalía y la de ganancias dejadas de percibir a base de la fórmula estatutaria (beneficios obtenidos en el pasado) implica una duplicación en la concesión de los daños, que le priva de su propiedad sin el debido proceso de ley. A juicio de la apelante, el estatuto excluye cualquier otra consideración que no sean los factores mencionados en el mismo.

Cita en su apoyo los casos de *Globe Liquor Co.* v. *Four Roses Distillers Company*, 281 A.2d 19 (1971), y de *Fornaris* v. *Ridge Tool Co.*, 423 F.2d 563 (1970). En *Globe Liquor Co.* una disposición relativa a la concesión de daños por la cancelación sin justa causa de un contrato de distribución similar a la nuestra,[11] se interpretó como mandatoria por el Tribunal Supremo de Delaware y se declaró inconstitucional por conceder compensación por daños aun en casos en que el distribuidor no tuviera pérdida alguna. Pág. 24. En *Fornaris* la Corte de Apelaciones para el Primer Circuito declaró inconstitucional la Ley Núm. 75 en su aplicación retroactiva, decisión que fue revocada por la Corte Suprema federal con instrucciones al tribunal de instancia de que se abstuviera de intervenir hasta que el Tribunal Supremo del Estado Libre Asociado de Puerto Rico interpretara el alcance de dicha ley. 400 U.S. 41 (1970).

---

[11] *Delaware Franchise Security Law*, 6 Del. Code Ann. Sec. 2556.

La posición de la apelante parte de una premisa errónea: que la formulación de daños es mandatoria meramente porque el texto del Art. 3, *ante*, provee que cualquier "cuantía *se fijará* a base de los siguientes factores. . .". La ley nunca debe interpretarse tomando una frase aislada, sino tomando en consideración integralmente todo su contexto. *Álvarez & Pascual, Inc.* v. *Srio. Hacienda*, 84 D.P.R. 482 (1962). Por eso, una lectura detenida del texto completo del Art. 3 revelará una intención distinta de la que le atribuye la apelante. Se notará que se provee en dicho artículo que la terminación sin justa causa por el principal constituye "un acto torticero contra el distribuidor y deberá indemnizarle en la medida de *los daños que le cause*, cuya cuantía se fijará *a base* de los siguientes factores. . .". Se trata de una acción torticera y, como tal, es requisito esencial de la misma la prueba sobre los daños sufridos. Como en toda acción de este tipo, el peso de probar los daños recae en quien lo alega. *Zambrana* v. *Hospital Santo Asilo de Damas*, 109 D.P.R. 517, 521 (1980). Los factores enumerados son solo guías para la determinación de la cuantía de los daños y no obligan al tribunal a conceder automáticamente indemnización aplicando todos y cada uno de los factores. El tribunal tiene discreción para aplicar los factores enumerados a la luz de las circunstancias específicas de cada caso conforme la prueba desfilada. Por supuesto, la indemnización nunca podrá tener carácter punitivo, pues, como se sabe, tales daños no existen en nuestra jurisdicción. *Carrasquillo* v. *Lippitt & Simonpietri, Inc.*, 98 D.P.R. 659, 669 (1970).

La partida de daños concedida por el tribunal de instancia asciende a la cantidad de $18,141 y se determinó exclusivamente mediante la aplicación del apartado *d* del Art. 3 al monto de los beneficios obtenidos por el distribuidor durante los últimos cinco años.[12] No hay, pues, duplicidad

---

[12] La determinación del tribunal sobre esta partida lee: "Las circunstancias

en la concesión de daños ni problema alguno sobre la aportación que hubiera podido hacer el principal a la plusvalía del negocio del distribuidor.

Por otro lado, la apelante no presentó prueba sobre actuaciones u omisiones de Marina Industrial, Inc. en violación de su obligación de mitigar los daños.

## VII

Estamos de acuerdo en que no procede la imposición de honorarios de abogado en este caso por tratarse de una cuestión no resuelta hasta el presente en nuestra jurisdicción.

*Se dictará sentencia que modifique la del tribunal de instancia a los fines de eliminar la partida de $1,500 en concepto de honorarios de abogado. Así modificada, será confirmada.*

El Juez Asociado Señor Díaz Cruz está conforme con las partes III, VI y VII y concurre en el resultado en las partes II, IV y V. El Juez Asociado Señor Rebollo López no intervino.

---

de su terminación unilateral demuestran que no existió justa causa para la misma. Por ello, según el artículo 3 de esa ley dicha acción se convirtió en un acto torticero contra la demandante y deberá la demandada indemnizarle en la medida de los daños causados, fijados en base al factor enumerado en el apartado (d) de esa disposición legal por efecto de la evidencia presentada. La misma se refirió al monto de los beneficios obtenidos en la relación establecida durante el período de su duración, o sea, desde julio 1ro. de 1970 hasta septiembre 30 de 1973, o 3.25 años. Aplicada la fórmula de ese artículo a los hechos de este caso tendremos que el promedio de los beneficios anuales obtenidos de esa relación durante este período —$11,791.63— equivale a $3,628.20 ($11,791.63 dividido entre 3.25 es igual a $3,628.20); ese promedio multiplicado cinco veces asciende a $18,141.00, cuantía de los daños."