EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Grifols, Inc.; Grifols USA, LLC; Grifols Therapeutics Inc.; Grifols Biological, Inc. y Cardinal Health PR 120, Inc.<br><br>Peticionarios<br><br>v.<br><br>Caribe RX Service, Inc.<br><br>Recurrido | Certiorari<br><br>2016 TSPR 147<br><br>195 DPR ____ |

Número del Caso: CC-2014-772
            Cons: CC-2014-773

Fecha: 30 de junio de 2016

**CC-2014-772**

Tribunal de Apelaciones:

        Región Judicial San Juan – Guayama, Panel I

 Abogados de la Parte Peticionaria:

        Lcdo. Mauricio O. Muñiz Luciano
        Lcdo. Omayra Sepúlveda Vega

 Abogados de la Parte Recurrida:

        Lcdo. Salvador Antonetti Zequeira
        Lcdo. Luis A. Oliver

**CC-2014-773**

Tribunal de Apelaciones:


Región Judicial San Juan - Guayama, Panel I


Abogado de la Parte Peticionaria:


Lcdo. Jorge E. Pérez Díaz
Lcdo. Jorge I. Peirats
Lcdo. Jason Aguiló Suro
Lcdo. Carlos E. Zayas Morales


Abogados de la Parte Recurrida:


Lcdo. Lcdo. Salvador Antonetti Zequeira
Lcdo. Luis A. Oliver


Materia: Sentencia del Tribunal con Opinión de Conformidad.


Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Grifols, Inc.; Grifols USA,
LLC; Grifols Therapeutics
Inc.; Grifols Biological, Inc.
y Cardinal Health PR 120, Inc.

    Peticionarios

       v.

Caribe RX Service, Inc.

    Recurrido

CC-2014-0772
CC-2014-0773

SENTENCIA

San Juan, Puerto Rico, a 30 de junio de 2016

El 12 de diciembre de 2014, emitimos una *Resolución* mediante la cual expedimos y ordenamos la consolidación de dos (2) recursos de *certiorari* presentados ante este Tribunal por los peticionarios. Mediante éstos, se solicitó la revisión de una determinación del Tribunal de Primera Instancia en la que se le concedió a Caribe Rx Service, Inc. (Caribe Rx) un interdicto provisional referente a la venta de productos manufacturados por Grifols Biological, Inc. (GBI) y Grifols Therapeutics, Inc. (GTI). Ello, pues, el foro primario razonó que Caribe Rx ostentaba una relación de distribución exclusiva respecto a ambas líneas de productos que estaba siendo infringida por los peticionarios.

En síntesis, en ambos recursos, los peticionarios argumentaron que tal proceder fue contrario a lo establecido por este Tribunal en *Next Step Medical v. Bromedicon*, 190 D.P.R. 474 (2014), puesto que la relación contractual entre las entidades Grifols y Caribe Rx no era una de exclusividad en torno a los productos de GTI. Por ello, los peticionarios estiman que la concesión del remedio provisional en cuestión tuvo el efecto de rescribir las relaciones contractuales entre las partes y, además, contraviene los preceptos que informan el Artículo 3 de la *Ley de Contratos de Distribución*, Ley Núm. 75 de 24 junio de 1964, 10 L.P.R.A. secs. 278-278(e).

Evaluado el expediente y el Derecho aplicable, se modifica el *injunction* emitido por el foro primario. Por tanto, se revoca la prohibición impuesta a las entidades Grifols respecto a la venta de los productos de GTI a Cardinal Health PR 120, Inc. o cualquiera de sus afiliadas o sucesoras, así como otros distribuidores para la reventa en Puerto Rico. De otra parte, se reafirma dicha prohibición, respecto a las mismas partes, en cuanto a los productos de GBI. Por último, se ordena la continuación de los procedimientos de conformidad con lo aquí resuelto.

Así lo pronunció el Tribunal y certifica el Secretario del Tribunal Supremo. La Juez Asociada señora Rodríguez Rodríguez emitió una Opinión de Conformidad a la que se une la Jueza Presidenta Oronoz Rodríguez y el Juez Asociado señor Estrella Martínez.

El Juez Asociado señor Martínez Torres concurre y hace constar la siguiente expresión a la que se une la Jueza Asociada señora Pabón Charneco y el Juez Asociado señor Feliberti Cintrón:

> "El Juez Asociado señor Martínez Torres concurre con el resultado, pues la controversia se resuelve por los fundamentos expuestos recientemente en Next Step Medical Co., Inc. et al. v. Biomet, Inc., et al., 2016 TSPR 120, 195 DPR ____ (2016)."

Juan Ernesto Dávila Rivera
Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Grifols, Inc.; Grifols USA, LLC; Grifols Therapeutics, Inc.; Grifols Biological, Inc. y Cardinal Health PR 120, Inc.<br><br>Peticionarios<br><br>v.<br><br>Caribe Rx Service, Inc.<br><br>Recurrido | CC-2014-0772<br>CC-2014-0773 |

Opinión de Conformidad emitida por la Juez Asociada señora Rodríguez Rodríguez a la que se une la Jueza Presidenta Oronoz Rodríguez y el Juez Asociado señor Estrella Martínez.

San Juan, Puerto Rico, a 30 de junio de 2016

Estoy conforme con el dictamen emitido por este Tribunal. Este caso ofrece la oportunidad de determinar la procedencia de una petición de *injunction* al amparo del Artículo 3 de la *Ley de contratos de distribución*, Ley Núm. 75 de 24 junio de 1964, 10 L.P.R.A. secs. 278-278(e), según enmendada, ante unos hechos muy particulares. A saber, es preciso examinar la procedencia del remedio interdictal en el contexto de una relación de distribución compleja donde coexisten acuerdos de distribución exclusiva y no exclusiva. Considerando que este Foro no ha analizado dicha disposición legislativa ante un marco fáctico similar, consigno esta opinión.

I

El 1 de mayo de 2005, Grifols Biological Inc. (GBI) suscribió un contrato de distribución con Caribe Rx Service, Inc. (Caribe Rx) en el que GBI lo designó como distribuidor no exclusivo, para el mercado de Puerto Rico, de sus productos hemoderivados.[1] Posteriormente, el 16 de enero de 2008, Grifols USA, en representación de GBI, suscribió un nuevo contrato de distribución mediante el cual se le concedió a Caribe Rx la distribución exclusiva, para el mercado de Puerto Rico, de los productos de GBI.[2]

El 7 de junio de 2010, el Sr. Gregory G. Rich y el Sr. William R. Stopher, presidentes y directores ejecutivos de Grifols Inc. y Grifols USA, respectivamente, le cursaron una misiva a Caribe Rx. En ésta, anunciaron que las entidades Grifols adquirirían la corporación Talecris Biotherapeutics, Inc. (Talecris), empresa que manufacturaba productos hemoderivados, algunos de los cuales competían en el mercado con los productos de las entidades Grifols. Expresaron, además, que dicha fusión tendría el resultado de expandir sus operaciones y líneas de productos.

---

[1] La controversia involucra varias entidades Grifols que deben ser diferenciadas, a saber: Grifols Inc. es una corporación organizada en el estado de Virginia que figura como la matriz de las entidades Grifols USA LLC. (Grifols USA), Grifols Biologicals, Inc. (GBI), y Grifols Therapeutics, Inc. (GTI).

[2] Grifols USA y Caribe Rx renovaron dicho contrato en tres (3) ocasiones, por lo que Caribe Rx ostentó la distribución exclusiva de los productos de GBI hasta el 31 de diciembre de 2011.

A esos efectos, en el mes de mayo de 2011, Caribe Rx sostuvo una conversación vía telefónica con representantes de las entidades Grifols en la que éstos le informaron sobre el estado avanzado de los procedimientos relacionados a la adquisición de Talecris y las oportunidades que este negocio produciría para el mercado de Puerto Rico. Así, pues, Caribe Rx presumió que manejaría una nueva cartera de productos como consecuencia de esta fusión corporativa. Finalmente, el 21 de junio de 2011, Grifols anunció que el proceso de adquisición de Talecris había culminado exitosamente.

El 16 de febrero de 2012, se llevó a cabo una reunión, en Carolina del Norte, entre los representantes de Caribe Rx y la nueva gerencia de Grifols USA. Durante ésta, Caribe Rx realizó una presentación en la que expuso las particularidades de su negocio, su trayectoria como distribuidor exclusivo de GBI para el mercado de Puerto Rico y sus expectativas sobre el futuro de la relación contractual. Aunque los representantes de Grifols USA le aseguraron a Caribe Rx que continuaría distribuyendo exclusivamente los productos de GBI para el mercado de Puerto Rico, le informaron que no podían ofrecerle, al momento, la distribución exclusiva de la nueva línea de productos de Grifols Therapeutics, Inc. (GTI), antigua

Talecris.[3] Ello, puesto que existían contratos de distribución vigentes, pactados entre diversos distribuidores y la antigua Talecris, en los que se le reconocía autorización a éstos para distribuir los productos de GTI en el mercado de Puerto Rico.

Por tanto, Grifols USA explicó que no podría suscribir documento alguno donde le otorgara exclusividad a Caribe Rx para la distribución de dichos productos, hasta tanto estos contratos expiraran. A esos efectos, Grifols USA especuló que dichas relaciones contractuales culminarían para finales del año 2012.

En consideración a lo anterior, le delegaron al Sr. Ronald Stephens, gerente de cuentas nacionales de GTI, la encomienda de concertar un plan de transición que incorporara la línea de productos de GTI al acuerdo de distribución exclusiva de Caribe Rx para el mercado de Puerto Rico. Esto, una vez vencieran los referidos contratos de distribución.

El 13 de marzo de 2012, Grifols USA le cursó a Caribe Rx un nuevo borrador de contrato. Éste se diferenciaba de los pactados anteriormente ya que establecía una distinción entre los productos que Caribe Rx podría distribuir de forma exclusiva y aquellos que sólo podría distribuir de forma no

---

[3] El 10 de agosto de 2011, se enmendó el certificado de incorporación de Talecris, ante el Departamento de Estado del estado de Delaware, para cambiar su nombre a Grifols Therapeutics, Inc. (GTI).

exclusiva. A saber, Caribe Rx continuaría manejando la distribución exclusiva de los productos de GBI, tal y como lo hizo desde el año 2008 hasta el año 2011. No obstante, la nueva línea de productos de GTI sería distribuida de forma no exclusiva, en atención a lo que los representantes de Grifols USA le informaron a Caribe Rx durante la reunión del mes de febrero de 2012.

Como respuesta, el 16 de marzo de 2012, Caribe Rx le envió una comunicación a Grifols USA en la que identificó aquellos aspectos del contrato con los que estaba en desacuerdo; particularmente, lo relacionado con la distribución no exclusiva de los productos de GTI. Posteriormente, el 23 de marzo de 2012, el Sr. Joel Abelson, presidente de las operaciones comerciales de Grifols USA en Norteamérica, le envió a Caribe Rx un correo mediante el cual informó que designó personal de su equipo de trabajo para atender las incomodidades señaladas y expresó que "[n]othing has changed (in terms of our intentions since our meeting in North Carolina[)] . . . Please continue to work with our team on these various issues so that we can come to an agreement that works for both companies". *Apéndice*, pág. 866.

Durante el proceso de negociación, mientras sostenían una conversación vía telefónica con Caribe Rx, los representantes de Grifols USA reafirmaron que no era posible reconocer en el contrato que cancelarían relaciones de

distribución prexistentes, ya que ello podría exponerlos a incurrir en incumplimiento contractual. Asimismo, reiteraron que era necesario esperar al vencimiento de dichos contratos para enmendarlos y garantizarle a Caribe Rx la distribución exclusiva respecto a los productos de GTI.

Así las cosas, durante el mes de abril del año 2012, Grifols, Inc., GTI y GBI suscribieron un contrato de distribución con Caribe Rx para el periodo de 1 de abril de 2012 al 31 de diciembre de 2012. Conforme al resultado de las negociaciones entre las partes, la cláusula 1 disponía que Caribe Rx sería el distribuidor exclusivo de los productos de GBI y un distribuidor no exclusivo de los productos de GTI para el mercado de Puerto Rico.[4]

Dicho contrato contenía, además, una cláusula en la que se estipuló, en lo pertinente, que este acuerdo era el único que regía las relaciones de distribución ahí contempladas,

---

[4] Véase *Apéndice*, pág. 867 ("Territory. Subject to Distributor's compliance with all the terms and conditions of this Agreement, Distributor is, as of the Effective Date, the exclusive Authorized Distributor of Record ("ADR") for the Products made by Grifols Biological, Inc. and identified in Exhibit A and the Non-exclusive ADR for the Products identified in Exhibit B (individually the "Product" or collectively the "Products") in Puerto Rico (the "Territory"). Distributor acknowledges that Grifols is unable to grant exclusive distribution rights for the Products made by Grifols Therapeutics Inc. and identified in Exhibit B due to valid pre-existing contracts entered into by the prior owner of such products; and therefore, Distributor shall not make any claim asserting exclusive rights to the Products identified in Exhibit B. Distributor shall resell Products only within the Territory. The Agreement grants no rights to Distributor outside the Territory".)

desplazando cualquier otro pacto al que hubieran llegado las partes con anterioridad al mismo.[5]

Posteriormente, el 1 de noviembre de 2012, conforme a lo estipulado en el contrato, Caribe Rx le notificó a Grifols USA su intención de renovarlo.[6] Como respuesta, Grifols USA le envió un borrador de enmienda; no obstante,

---

[5] Véase *Apéndice*, pág. 875 ("Entire Agreement/Waiver. This Agreement constitutes the entire Agreement between the parties with respect to its subject matter and supersedes all prior and contemporaneous understanding and agreements. The terms and conditions of this Agreement may not be waived, modified or amended in any way by conduct, custom or course of dealing; instead, they may be waived only by a written document signed by both parties. The waiver by a party of any term or condition of this Agreement shall not be deemed to be a waiver of any subsequent breach by the other party of the same term or condition or any other term or condition of this Agreement. The subsequent acceptance of performance by a party of any breached term or condition of this Agreement shall not be deemed to be a waiver of any preceding breach by the other party of the same term or condition or any other term or condition of this Agreement, regardless of whether the accepting party knew or did not know of the preceding breach at the time of acceptance of such performance".)

[6] Véase *Apéndice*, pág. 867 ("Term; Extended Terms. The Agreement shall remain in effect from the Effective Date until and including the End Date of December 31, 2012 (the "Term"); provided, however, that Distributor shall have the right to renew this Agreement beyond the Term, for subsequent periods of one year (the "Extended Terms"). Should Distributor decide to exercise the right to renew this Agreement beyond the Term, or beyond the conclusion of each of the Extended Terms, it shall notify the Company of its intent to renew the Agreement in writing not later than sixty (60) days prior to the expiration of the Term or the expiration of each of the Extended Terms, as the case may be, but not more than 180 days prior to the expiration of the Term or Extended Terms. As provided in applicable laws and in this Agreement, the Company shall have the right to terminate this Agreement for just cause, at any time, upon Distributor's repeated failure to comply with the essential obligations of this Agreement. This Agreement may be likewise terminated, at any time, by mutual written consent of the Company and Distributor".)

en éste no se contempló la relación de distribución exclusiva respecto a los productos de GTI. Por ello, el 29 de enero de 2013, Caribe Rx, al entender que los contratos de distribución prexistentes ya no eran un obstáculo, le solicitó a Grifols USA que incluyeran los productos de GTI bajo su distribución exclusiva. Grifols USA acusó recibo de dicha comunicación e indicó que respondería a la misma.

Nótese que, durante los meses de diciembre de 2012 y enero de 2013, Grifols USA y Cardinal Health 108, Inc. (Cardinal Health 108) suscribieron un contrato de distribución no exclusiva para el año 2013, respecto a los productos de GTI, que comprendía el mercado de Estados Unidos y otros mercados. En dicho acuerdo se estipuló, además, que Cardinal Health 108 no podría vender directamente los productos de GBI en el mercado de Puerto Rico.

En el mes de febrero de 2013, Caribe Rx sostuvo una reunión de negocios con Cardinal Health PR 120, Inc. (Cardinal Health 120).[7] Durante dicha reunión, Cardinal Health 120 no reconoció que Caribe Rx ostentara la distribución exclusiva de los productos de GTI. En

---

[7] Cabe destacar que Cardinal Health 108, corporación organizada en el estado de Tennessee, es una entidad distinta a Cardinal Health 120. Ésta última es una corporación organizada al amparo de las leyes del Estado Libre Asociado de Puerto Rico. Según las determinaciones de hechos del Tribunal de Primera Instancia, ésta vende productos hemoderivados de varios manufactureros, incluidos los productos de las entidades Grifols, en el mercado de Puerto Rico.

consecuencia, Caribe Rx le solicitó a Grifols USA que le aclarase a Cardinal Health 120 que era el distribuidor exclusivo de los productos de Grifols, independientemente de quién los manufacturase, a saber, GBI o GTI.

Luego de sostener varias conversaciones vía telefónica sobre el particular, Grifols USA le informó a Caribe Rx que no sería factible concederle la distribución exclusiva de los productos de GTI, ya que no sería posible cancelar las relaciones contractuales vigentes para así hacerlo.

Como consecuencia, Caribe Rx presentó, el 18 de abril de 2013, una demanda ante el Tribunal de Primera Instancia contra las entidades Grifols y Cardinal Health 120. En ésta, alegó violación a la *Ley de contratos de distribución*, Ley Núm. 75 de 24 junio de 1964, 10 L.P.R.A. secs. 278-278(e), según enmendada; incumplimiento de contrato, e interferencia torticera con una relación contractual. Asimismo, presentó una *Moción solicitando remedio provisional* en virtud del Artículo 3-A de la precitada disposición legal.

Luego de múltiples incidentes procesales, el Tribunal de Primera Instancia ordenó la celebración de una vista evidenciaria para resolver la solicitud de remedio provisional.[8] La misma se llevó a cabo el 20 de marzo y el

---

[8] Las entidades Grifols presentaron ante el Tribunal de Distrito Federal para el Distrito de Puerto Rico un *Notice for Removal*, aduciendo que dicho foro era el que tenía jurisdicción para resolver la controversia. No obstante, el 31 de octubre de 2013, el Tribunal de Distrito, mediante orden, se declaró sin jurisdicción para atender la

15 de abril de 2014. En ésta, se recibió extensa prueba documental y testificaron el Lcdo. Rafael Emanuelli, vicepresidente de Caribe Rx, y el Sr. Jim Vollins, oficial superior de la división legal de GTI.

Celebrada la vista, el 2 de mayo de 2014, el Tribunal de Primera Instancia emitió una *Resolución y Orden*, mediante la cual ordenó a Grifols, Inc.; Grifols USA, GBI y GTI a que se abstuviesen de menoscabar los derechos de Caribe Rx durante la pendencia del pleito. Por ello, el foro primario ordenó a cesar y desistir de la venta de productos de Grifols, incluyendo aquellos manufacturados por la antigua Telacris, a Cardinal Health 120 y cualquiera de sus afiliadas y sucesoras, así como a otros distribuidores para la reventa en el mercado de Puerto Rico.

Las entidades Grifols y Cardinal Health 120, presentaron recursos de *certiorari* ante el Tribunal de Apelaciones. En síntesis, arguyeron que erró el foro primario al conceder el remedio provisional. No obstante, el 30 de junio de 2014, el foro apelativo intermedio emitió una

---

controversia y devolvió el caso al foro primario. En ese entonces, las entidades Grifols le solicitaron al foro de instancia que resolviera diversas mociones de desestimación, presentadas ante el Tribunal de Distrito, bajo el fundamento de que el contrato de distribución contenía una cláusula de selección de foro que impedía a este tribunal atender la controversia. El Tribunal de Primera Instancia denegó dicha petición. Finalmente, las entidades Grifols acudieron oportunamente ante el Tribunal de Apelaciones. No obstante, el 14 de abril de 2014, dicho foro emitió una resolución en la que denegó el recurso de *certiorari* presentado.

*Resolución* en la que denegó la expedición del recurso solicitado.

Al igual que el Tribunal de Primera Instancia, el Tribunal de Apelaciones razonó que las conversaciones previas a la firma del contrato de 2012 concedían un derecho de distribución exclusiva a Caribe Rx, tanto para los productos de GBI como los de GTI, una vez vencidos los contratos de la antigua Talecris para finales del año 2012. El 29 de julio de 2014, Cardinal Health 120 presentó una *Solicitud de Reconsideración* ante el foro apelativo intermedio, la cual fue denegada mediante *Resolución* el 13 de agosto de 2014.

Inconformes, tanto Cardinal Health 120 como las entidades Grifols presentaron peticiones de *certiorari* ante este Tribunal. En síntesis, ambos peticionarios arguyen que erraron los foros recurridos al conceder el remedio provisional en cuestión. En lo pertinente, argumentan que dicho proceder fue contrario a Derecho puesto que contravenía nuestros pronunciamientos en *Next Step Medical v. Bromedicon*, *supra*. Particularmente, fundamentaron su contención en que el contrato vigente entre las entidades Grifols y Caribe Rx dispuso, de forma diáfana, el carácter no exclusivo de la relación de distribución referente a los productos de GTI y la revocación de cualquier acuerdo anterior al que hayan llegado las partes.

En consideración a lo anterior, los peticionarios plantean que el proceder de los tribunales recurridos tuvo el efecto de reformular las relaciones jurídicas entre las partes, concediéndole a Caribe Rx una relación de exclusividad que nunca tuvo. Por último, resaltan que tal resultado atenta contra el propósito de los remedios contemplados en el Artículo 3-A de la Ley Núm. 75, *supra*, a saber, conservar el *status quo* respecto a las relaciones jurídicas entre las partes.

El 12 de diciembre de 2014, este Tribunal emitió una *Resolución* mediante la cual se ordenó la consolidación de ambos casos. Con el beneficio de las comparecencias de las partes, evalúo la presente controversia.

## II

### A

Aunque el desarrollo de las relaciones comerciales ha dado paso a una multiplicidad de métodos para configurar los negocios jurídicos, el contrato subsiste como su piedra angular. Éste, en esencia, es una "convención o acuerdo de voluntades por el que se crean, modifican o extinguen relaciones jurídicas de contenido patrimonial". José Puig Brutau, *Fundamentos de Derecho Civil Doctrina General del Contrato* 10, T. II., Vol. I (3ra ed. 1988).

El Artículo 1206 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 3371, dispone que un contrato existe desde que una o varias personas consienten a obligarse respecto de

otra u otras. Así, pues, su existencia está condicionada a un punto clave en el tiempo donde se armonizan intereses opuestos mediante un acuerdo de voluntades. Luis Díez-Picazo, *Fundamentos del Derecho Civil Patrimonial Introducción Teoría del Contrato* 95, T. I (6ta ed. 2007); José Luis Concepción Rodríguez, *Derecho de Contratos* 54 (2003); José Puig Brutau, *supra*, en las págs. 167-168.

A esos efectos, la doctrina tradicional desglosa la vida de un contrato en tres (3) etapas, a saber: la generación, el perfeccionamiento y la consumación. Para resolver esta controversia, es preciso distinguir las primeras dos. En primer lugar, la generación "trata de un período preparatorio, que da como resultado una serie de actos, de los cuales surge el consentimiento contractual". Luis Díez-Picazo, *supra*, en la pág. 331.

Durante esta fase pueden llevarse a cabo conversaciones, intercambios de información y posibles adelantos de condiciones contractuales que den paso a tratos preliminares. Conviene reiterar que éstos "no suponen la fijación definitiva de una oferta contractual, sino la realización de actos preparatorios de un (eventual e hipotético) contrato que a, la postre, puede llegar a celebrarse o no". Carlos Lasarte Álvarez, *Principios de Derecho Civil* 65, T. 2 (4ta ed. 1996); véase, además, Jaime

Santos Briz*, Los Contratos Civiles Nuevas Perspectivas* 74
(1992).

Los principios jurídicos que entran en función durante
la referida etapa precontractual deben ser cónsonos con la
oscilación que caracteriza las negociaciones entre las
partes. Por ello, hemos reconocido, de forma reiterada, que
"[e]s un principio básico del derecho de obligaciones que
nadie está obligado a contratar". *Colón v. Glamorous Nails*,
167 D.P.R. 33, 44 (2006). Por tanto, "las partes no están
obligadas a proseguir con las negociaciones hasta
perfeccionar el contrato, sino que están en libertad de
contraer el vínculo o de retirarse, según convenga a sus
mejores intereses". *Prods. Tommy Muñiz v. C.O.P.A.N.*, 113
D.P.R. 517, 526 (1982). Claro está, ello, sujeto al
principio de buena fe que impera en nuestro derecho
contractual.

Concluida la etapa precontractual, es necesario que la
voluntad interna de las partes se manifieste y que no haya
desavenencias entre lo querido y lo declarado en cuanto al
objeto y la causa del contrato. Véase 31 L.P.R.A. sec. 1214.

Ahora bien, es necesario aclarar que no toda
manifestación de voluntad puede ser considerada como
suficiente para configurar la formación de un contrato.
Luis Díez-Picazo, *supra*, en la pág. 187. La voluntad
suficiente es aquella manifestada con conciencia de las
consecuencias prácticas que han de establecerse tras su

exteriorización, así como de los efectos jurídicos que vincularán a los contratantes. Véase Marcel Planiol y Georges Ripert, *Tratado Elemental de Derecho Civil* 21, T. 5 (4ta ed. 2003). "[P]recisamente esta idea del consentimiento contractual como voluntad de crear una vinculación y como voluntad de vincularse permite separar los genuinos contratos de los que pueden ser considerados acuerdos no vinculantes . . .". Luis Díez-Picazo, *supra*, en la pág. 189.

Examinado lo anterior, resulta "obvio que determinar el momento de perfección del contrato es asunto de extraordinaria importancia y no una mera cuestión teórica, pues a partir de dicho momento la oferta dejará de ser tal [y] podrán compelerse las partes al cumplimiento del contrato". Carlos Lasarte Álvarez, *supra*, en la pág. 61.

**B**

La interpretación de los contratos conlleva un ejercicio de indagación dirigido a identificar la real voluntad de las partes. *Municipio de Mayagüez v. Lebrón*, 167 D.P.R. 713 (2006); *Merle v. West Bend Co.*, 97 D.P.R. 403, 409-410 (1969). A través de este proceso, se intenta "reconstruir el sentido de una declaración negocial [sic] para conseguir los efectos deseados por las partes". *Ramírez, Segal & Latimer v. Rojo Rigual*, 123 D.P.R. 161, 174 (1941). Claro está, dicho ejercicio se debe contextualizar en el principio de la autonomía de libertad de contratación.

Véase 31 L.P.R.A. sec. 3372; *Coop. Sabanera v. Casiano Rivera*, 184 D.P.R. 169, 173 (2011); *V.D.E. Corporation v. F & R Contractors*, 180 D.P.R. 21, 33 (2010); *B.P.P.R. v. Sucn. Talavera*, 174 D.P.R. 686, 693 (2008).

El Código Civil sienta las pautas para la interpretación contractual. "Como se sabe la tendencia de los tribunales es limitar la interpretación a los casos en que se haga verdaderamente necesaria". *Marcial v. Tome*, 144 D.P.R. 522 (1997). Por ello, como punto de partida, el Artículo 1233 del Código Civil establece que si los términos de un contrato son claros y no dejan duda sobre la intención de los contratantes, se estará al sentido literal de sus cláusulas. Véase 31 L.P.R.A. sec. 3471; *C.F.S.E. v. Unión de Médicos*, 170 D.P.R. 443, 450 (2007); *S.L.G. Irizarry v. S.L.G. García*, 155 D.P.R. 713, 726 (2001); *Marcial*, 144 D.P.R. en la pág. 536. "*Dicho criterio objetivo exige que la voluntad no manifestada quede descartada en interés de la buena fe y de la seguridad de las transacciones*. Hay que exceptuar el especial tratamiento que corresponde a los casos de error mutuo (disenso) y de fraude". José Puig Brutau, *supra*, en la pág. 169 (énfasis suplido).

Cabe señalar, además, que "[l]os términos de un contrato son claros cuando son suficientes en contenido para ser entendidos en un único sentido, sin dar lugar a dudas o controversias, sin diversidad de interpretaciones y sin necesitar, para su comprensión, razonamientos o

demostraciones susceptibles de impugnación". *C.F.S.E.*, 170 D.P.R. en la pág. 450.

De otra parte, la segunda oración del precitado artículo dispone que, si las palabras aparentaran ser contrarias a la intención de las partes, ésta última prevalecerá sobre aquellas. Véase 31 L.P.R.A. sec. 3471; *V.D.E. Corporation*, 180 D.P.R. en la pág. 35. El Artículo 1234 del Código Civil establece lo que el juzgador deberá considerar para evaluar la intención, a saber: "los actos de éstos [los contratantes] coetáneos y posteriores". 31 L.P.R.A. sec. 3472.[9] Hemos establecido que el contenido de esta disposición no constituye una limitación a las herramientas de hermenéutica, por lo que "[e]ste precepto es de carácter demostrativo, no taxativo, y, por lo tanto, no impide que se tomen en consideración actos anteriores a la contratación. Después de todo, los actos preparativos del contrato son muchas veces más imparciales que los posteriores". *Ramírez, Segal & Latimer*, 123 D.P.R. en la pág. 174. Véase *Municipio de Mayagüez*, 167 D.P.R. en la pág.

---

[9] Véase José Puig Brutau, *supra*, en la pág. 229 ("No se trata de investigar la voluntad interna de uno de los contratantes que no haya podido influir en la determinación de la otra parte contratante. El proceso interpretativo ha de demostrar que, al perfeccionarse el contrato, las partes adoptaron su decisión en atención a circunstancias que pudieron tener en cuenta. Como dice Lacruz, el intérprete debe investigar la voluntad interna de las partes, pero no para imponerla incondicionalmente, sino para determinar lo que hay de común en la decisión que adopten".). Véase, además, Jaime Santos Briz, *supra*, en las págs. 172-173.

724; *Unisys Puerto Rico, Inc. v. Ramallo Bros. Printing, Inc.*, 128 D.P.R. 842, 853 (1991); *Marina Ind., Inc. v. Brown Boveri Corp.*, 114 D.P.R. 64, 69-70 (1983).

Además, cabe resaltar que "el principio de lealtad incide sobre la interpretación de los contratos. Es decir, cuando resulta necesario determinar cuál fue la común voluntad de los contratantes, se entiende que éstos quisieron expresarse como lo hubiera hecho una persona de buena fe". *Municipio de Mayagüez*, 167 D.P.R. en la pág. 724. Por tanto, "no se puede buscar oscuridad ni tergiversar la interpretación de los contratos para llegar a resultados absurdos o injustos". S.L.G. Irizarry, 155 D.P.R. en la pág. 726. Véase *V.D.E. Corporation*, 180 D.P.R. en la pág. 36.

Por otro lado, hemos reconocido que la interpretación de la declaración de voluntad no se puede realizar en el vacío. Por ello, se debe tomar en consideración la ocasión, las circunstancias, las personas y el acuerdo que se intentó llevar a cabo. Véase *Ramírez, Segal & Latimer*, 123 D.P.R. en la pág. 174. Asimismo, hemos comentado que "[e]n la determinación sobre cuál ha sido la intención de las partes al contratar, resulta de suma importancia tomar en consideración quiénes son las partes, en particular sus experiencias y conocimientos especializados sobre la materia sobre la cual versa el contrato". *Unisys*, 128 D.P.R. en la pág. 853. A esos efectos, y de pertinencia al caso de autos, al disponer de una controversia donde una de las partes

contratantes era un profesional del Derecho, determinamos que "[e]s preciso que tengamos en cuenta el hecho de que la aquí recurrente es abogada y no una persona lega, por lo que no desconoce la terminología y las condiciones contractuales bajo las cuales se llevan a cabo este tipo de negocios jurídicos". *C.N.A. Casualty de P.R. v. Torres Díaz,* 141 D.P.R. 27, 39 (1996).

Por último, "[u]na vez se determina lo que las partes acordaron, el juzgador debe resolver las controversias entre las partes acorde a lo estipulado". *C.F.S.E.*, 170 D.P.R. en la pág. 451 (2007).

### III

La *Ley de contratos de distribución* reglamenta la terminación de las relaciones contractuales entre los distribuidores de productos y servicios en el mercado de Puerto Rico y aquellos principales o concedentes que los emplean.[10] Véase *Pacheco v. Nat'l Western Life Ins. Co.*, 122 D.P.R. 55, 62-63 (1988); *Marina Ind.*, 114 D.P.R. 64 (1983). Considerando que las relaciones de distribución son vitales para la economía, el interés público y el bienestar general de nuestro País, la Legislatura aprobó esta medida con el

---

[10] Para propósitos de la Ley Núm. 75, un distribuidor es aquella "[p]ersona realmente interesada en un contrato de distribución por tener efectivamente a su cargo en Puerto Rico la distribución, agencia, concesión o representación de determinada mercancía o servicio". 10 L.P.R.A. sec. 278. De otra parte, un principal o concedente es aquella "[p]ersona que otorga un contrato de distribución con un distribuidor". *Id.*

propósito de implantar un esquema regulatorio que propiciara una estabilidad razonable en el ámbito de los negocios jurídicos que las componen. Véase *Warner Lambert Co. v. Tribunal Superior*, 101 D.P.R. 378, 398 (1973); *Walborg Corp. v. Tribunal Superior*, 104 D.P.R. 184 (1975).

Con tal de impartirle efectividad a los postulados de esta legislación, se estableció una causa de acción de carácter torticera a favor de los distribuidores. Ésta contempla aquellas circunstancias en las cuales, de manera arbitraria: (1) se efectúa una terminación de un contrato de distribución; (2) se produce un menoscabo de la relación contractual, o (3) se deniega la renovación de la misma.[11] En consecuencia, la Ley Núm. 75 priva al principal o concedente de realizar dichas actuaciones, excepto en instancias donde medie justa causa para ello. 10 L.P.R.A. secs. 278a y 278a-1. "Nótese que la justa causa se limita a actos imputables al distribuidor. Solamente cuando el distribuidor incurra en incumplimiento de algunas de las condiciones esenciales o afecte adversamente en forma sustancial los intereses del principal, éste puede dar por terminado el contrato sin reparación de daños". *Warner*

---

[11] La causa de acción que provee este estatuto puede ser utilizada para proteger tanto contratos de distribución exclusiva, como aquellos de distribución no exclusiva. Véase *Next Step Medical*, 190 D.P.R. en las págs. 493-494; *P.R. Oil v. Dayco*, 164 D.P.R. 486, 502 (2005); *Lorenzana v. Gen. Accid. Ins. Co.*, 154 D.P.R. 547 (2001); *San Juan Merc. v. Canadian Transport Co.*, 108 D.P.R. 211 (1978).

*Lambert Co.*, 101 D.P.R. en la pág. 400; véase, además, *Medina & Medina v. Country Pride Foods*, 122 D.P.R. 172, 186 (1988).

De otra parte, cónsono con el propósito que persigue la Ley Núm. 75, el legislador le confirió a los tribunales el poder de conceder remedios provisionales o medidas de naturaleza interdictal durante el curso de un litigio al amparo de esta ley. Véase *Next Step Medical Co., Inc. et al. v. Biomet, Inc., et al.*, 2016 T.S.P.R. 120, 195 D.P.R. ___ (2016). Ello, pues, se interesaba "evitar la realización de actos *que podrían producir daños irreparables*, mientras se dilucida la existencia o no, de justa causa para la terminación de la relación contractual". Véase *Next Step Medical*, 190 D.P.R. en la pág. 490 (énfasis suplido). Ahora bien, debo puntualizar que el propósito de estos remedios es "*evita[r] el debilitamiento del distribuidor* en esta etapa crucial del conflicto y nivela[r] el poder real de las partes. A manera de un primer auxilio, equivale a un torniquete que *evita que se desangre el distribuidor mientras reclama los derechos consagrados en la Ley Núm. 75*". *Systema de P.R., Inc. v. Interface Int'l*, 123 D.P.R. 379, 387 (1989) (énfasis suplido).

Recientemente, en *Next Step Medical*, reconocimos que el remedio interdictal preceptuado en el Artículo 3-A de la Ley Núm. 75 es uno de origen estatutario que requiere un tratamiento especial. Esto es, el análisis para determinar

su procedencia debe realizarse estableciendo un balance entre los criterios rectores para la expedición del *injunction* clásico y la política pública que persigue en la referida Ley. Ahora bien, en esa ocasión advertimos que "aunque la Ley Núm. 75 fue expresamente promulgada para proteger los intereses de los distribuidores, la concesión de su remedio extraordinario no puede ser automática". *Id.* en la pág. 498.

Evaluados los fundamentos a ser empleados al considerar la expedición del remedio en cuestión, es necesario ilustrar los criterios particulares a ser examinados. En primer lugar, el juzgador debe determinar si la parte peticionaria evidenció que es un distribuidor, según definido por la Ley Núm. 75. Satisfecho este criterio de umbral, procede examinar los intereses de las partes, enmarcados en los propósitos de la política pública comprendidos en esta Ley. Para ello, se debe ponderar lo siguiente: (1) la naturaleza de los daños que puede provocarle a la parte peticionaria la denegatoria del remedio solicitado; (2) el impacto del recurso sobre el interés público, y (3) las razones por las cuales se debe mantener el vínculo contractual vigente, *vis à vis*, la posibilidad de que la causa se torne académica.[12]

---

[12] En *Next Step Medical*, además, esclarecimos que la parte peticionaria de este remedio no tiene que necesaria o forzosamente probar lo siguiente: (1) la existencia de daños irreparables; (2) la falta de justa causa para el menoscabo o terminación del vínculo contractual, y (3) la probabilidad de prevalecer en el juicio en su fondo. Esto, como se sabe,

Por último, es esencial puntualizar que este Tribunal decidió, en *Next Step Medical*, que si la petición del interdicto preliminar se basa en el "menoscabo sufrido como consecuencia de que el principal [haya] infringi[do] un acuerdo de exclusividad con el distribuidor . . . le corresponde a este último demostrar en la segunda parte del escrutinio el alegado carácter de exclusividad del pacto en relación a los demás criterios requeridos para la concesión del recurso". *Next Step Medical*, 190 D.P.R. en la pág. 502.

## IV

Como anticipé, los peticionarios arguyen que los foros recurridos erraron al conceder el remedio interdictal provisto en el Artículo 3-A de la Ley Núm. 75. Por lo tanto, la controversia exige determinar la procedencia de ese remedio provisional conforme a los hechos antes reseñados.

En primer lugar, no hay duda de que Caribe Rx es un distribuidor conforme a la Ley Núm. 75. Ello queda de manifiesto tras un análisis de la relación contractual de distribución que Caribe Rx ostentó con las entidades Grifols desde el año 2005.[13]

---

sería imperativo si se tratara de un *injunction* en otro contexto que no fuera al amparo de la ley especial que nos ocupa.

[13] Surge del expediente que Caribe Rx, al comprar los productos de las entidades Grifols, adviene dueño de éstos. Desde entonces, Caribe Rx controla el manejo, almacenamiento y reventa de dichos productos. Consecuentemente, éste asume el riesgo de su pérdida o

Satisfecho ese criterio de umbral, precisa determinar si Caribe Rx, al momento de solicitar el remedio provisional, tenía la distribución exclusiva de los productos de las entidades Grifols, incluyendo aquellos manufacturados por GTI. Conforme a los principios de interpretación contractual reseñados, comienzo por examinar las disposiciones del contrato de distribución que suscribieron Grifols USA y Caribe Rx en el mes de abril de 2012.

Según surge de los hechos, el referido contrato delineó el carácter de la relación de distribución entre las partes contratantes. En particular, Caribe Rx figuró como distribuidor no exclusivo de los productos de GTI y se hicieron constar las razones por las cuales Grifols USA no podía otorgarle la distribución exclusiva de dichos productos -sin sujeción al futuro vencimiento de algún contrato prexistente-. Del mismo modo, Caribe Rx se comprometió a no hacer reclamación alguna respecto a la distribución exclusiva de los productos de GTI.

Asimismo, es esencial reiterar que en dicho contrato se incluyó una cláusula mediante la cual, en lo pertinente, se estipuló que el contrato: (1) constituía el único pacto

---

expiración. De otra parte, Caribe Rx realiza, por ejemplo, aquellas gestiones de cobro pertinentes y asume todo riesgo y pérdida relacionados con el manejo de los referidos productos. Por último, no cabe duda que Caribe Rx realiza, a su costo, diversas gestiones de promoción y mercadeo para aquellas líneas de productos Grifols que maneja. *Apéndice*, págs. 1272-1273.

entre las partes y (2) desplazaría cualquier acuerdo previo respecto a los asuntos ahí contemplados.

A pesar de que el lenguaje de las referidas disposiciones es claro, Caribe Rx argumenta que, previo a su constitución, Grifols USA le concedió la distribución exclusiva en cuestión y tal acuerdo debió cobrar vigencia a inicios del año 2013. Con tal de erradicar las suspicacias que puedan levantar planteamientos de esta índole, este Tribunal "no ha vacilado en indagar más a fondo sobre cuál ha sido la verdadera intención de las partes". *Marcial*, 144 D.P.R. en la pág. 536. Por ello, considero, si bien someramente, los actos anteriores, coetáneos y posteriores a la otorgación del referido contrato.

Los sucesos anteriores al perfeccionamiento del contrato se limitan a conversaciones, de ambas partes, sobre intenciones y posibles propuestas para la concesión a Caribe Rx de la distribución exclusiva de los productos de GTI. Soy del criterio que dichos actos no entrañaron la concreción de una relación propiamente contractual. En particular, ello es evidente al contrastar la actuación de las partes previo al envío del borrador de contrato y aquella manifestada con posterioridad. Las negociaciones que se suscitaron en ese momento, donde se cursaron múltiples borradores de enmiendas y se llevaron a cabo un sinnúmero de conversaciones vía telefónica y vía electrónica, constituyeron el punto de

encuentro de voluntades que debían armonizarse para dar paso al perfeccionamiento de la relación contractual.

Evidentemente, Caribe Rx, por conducto de su vicepresidente —quien es un profesional del Derecho—, intentó concretar aquellas intenciones y propuestas que ambas partes había desarrollado durante el transcurso de las negociaciones. Ahora bien, la firma del contrato en cuestión demuestra que Caribe Rx aceptó los términos y condiciones con que ambas partes lograron estar de acuerdo.

Posteriormente, tras la manifestación de intención de Caribe Rx de renovar el contrato en cuestión, Grifols USA mantuvo inalterada su oferta respecto a la relación de distribución que sostendría con Caribe Rx. En ese momento, Caribe Rx estaba llamado a reanudar un proceso de negociación para que su interés de convertirse en distribuidor exclusivo de los productos de GTI se hiciera parte del contrato a perfeccionarse. Ello, puesto que no podía pretender que Grifols USA se viera obligado por intenciones y propuestas previas que no se concretaron en una relación contractual y fueron, efectivamente, desplazadas por la precitada cláusula suscrita por ambas partes.

Dar curso al planteamiento de Caribe Rx sería atentar contra el aludido principio de lealtad, con tal de imponer la voluntad de una de las partes que no logró su cometido de configurar la relación contractual conforme a todos sus

intereses. Dicho proceder tendría el resultado de menoscabar la seguridad de las relaciones contractuales que nuestro ordenamiento jurídico busca proteger. Además, ello trastocaría el carácter del contrato de distribución que se distingue "por su continuidad, estabilidad, confianza mutua [y] coordinación entre ambas partes *en calidad de empresarios independientes, sin subordinación jerárquica*". *Lorenzana v. Gen. Accid. Ins. Co.*, 154 D.P.R. 547, 553 (2001) (citas omitidas).

Por estas razones, estimo que la presunta relación de exclusividad, en lo que concierne a los productos de GTI, no se perfeccionó. Consecuentemente, concluyo que erró el Tribunal de Primera Instancia al conceder el interdicto preliminar con relación a los productos de GTI, que fuera avalado, sin más, por el Tribunal de Apelaciones.

Ahora bien, considerando que la controversia de autos versa sobre la concesión de un remedio provisional respecto a dos líneas de productos, resta por determinar si procedía la concesión del interdicto provisional en cuanto a los productos de GBI.

Concluyo, en primer lugar, que Caribe Rx probó efectivamente que ostentaba una relación de distribución exclusiva vigente respecto a dichos productos. Ello queda de manifiesto al evidenciarse la renovación de la relación contractual con las entidades Grifols para el año 2013,

conforme al procedimiento estipulado en el contrato. Véase nota 6, *supra*.

Por lo tanto, en el contexto de estos productos, corresponde sopesar los intereses de las partes con la política pública que orienta la concesión del remedio solicitado. Según surge de las determinaciones de hechos que realizó el Tribunal de Primera Instancia, Caribe Rx expuso la naturaleza de los daños que éstos sufrirían de denegarse el remedio provisional. A esos efectos, el foro primario expresó que "[d]urante la vigencia de la relación entre Grifols y Caribe Rx, Cardinal [Cardinal Health 120] ha ofrecido a través de su sistema electrónico de venta para Puerto Rico, los productos Grifols fabricados por Grifols Biological [GBI]". *Apéndice*, pág. 1171. En particular, Caribe Rx planteó que las actuaciones de los peticionarios podrían repercutir en una reducción de su volumen de ventas y tienen el efecto de concederle a Cardinal Health 120 los beneficios resultantes del mercado que desarrolló Caribe Rx para los productos de GBI en Puerto Rico, a su costo y su favor, mediante diversas estrategias y actividades de promoción, desde que comenzó su relación contractual con las entidades Grifols.

De otra parte, los peticionarios no presentaron evidencia tendente a demostrar los efectos, si alguno, de cómo se verían afectados por la concesión del remedio solicitado respecto a los productos de GBI. Véase, *Next Step*

*Medical Co., Inc.*, 2016 T.S.P.R. 120, en la pág. 16. Estimo que, ello es así, debido a la patente claridad del contrato de distribución entre Caribe Rx y las entidades Grifols respecto a la relación de distribución exclusiva sobre estos productos y la imposibilidad de que Cardinal Health 120, sus afiliadas o sucesoras, y otros distribuidores, distribuyan directamente los productos de GBI en el mercado de Puerto Rico.

Según reseñé, la Ley Núm. 75, *supra*, tiene como propósito proveer una defensa a los intermediarios que representan productos o servicios en los diversos niveles de una cadena de distribución. En concreto, la intención de esta medida es detener aquellas prácticas indebidas que tengan el efecto de terminar o menoscabar, sin causa justificada, las relaciones con los distribuidores luego de que éstos han creado un mercado favorable para sus productos. Esto, pues, dichos actos frustrarían "las legítimas expectativas e intereses de los que tan eficientemente han cumplido con sus responsabilidades". *Walborg Corp.,* 104 D.P.R. en la pág. 188; véase, además, *J. Soler Motors v. Kaiser Jeep Int'l*, 108 D.P.R. 134 (1978). En lo práctico, esta Ley persigue nivelar las condiciones de contratación de dos grupos económicamente dispares. *Medina & Medina*, 122 D.P.R. en la pág. 183; Walbor Corp., 104 D.P.R. en la pág. 189.

El Artículo 3-A de la Ley Núm. 75 establece que el tribunal podrá conceder cualquier remedio provisional "[e]n cualquier pleito en que esté envuelta directa o indirectamente la terminación de un contrato de distribución o cualquier acto en menoscabo de la relación establecida entre el principal o concedente . . .". 10 L.P.R.A. sec. 728b-1. Soy del criterio que el proceder de los peticionarios entraña un acto en menoscabo de la relación de distribución exclusiva entre Caribe Rx y las entidades Grifols respecto a los productos de GBI. Por lo tanto, determinar que el remedio solicitado es improcedente en cuanto a esta línea de productos atentaría contra la política pública consagrada en los postulados de la Ley Núm. 75. En sí, dicho resultado tendría un impacto negativo en el interés público ya que haría inefectivos los remedios provistos por esta Ley.

Consecuentemente, los tribunales inferiores, respecto a los productos de GBI, actuaron en consonancia con el mandato legislativo consagrado en el Artículo 3-A de la Ley Núm. 75 al mantener el estado de las relaciones contractuales vigentes y evitar que la causa de acción se tornara académica.

**V**

Por los fundamentos que anteceden, resulta forzoso concluir que erró el Tribunal de Primera Instancia, al igual que el foro apelativo intermedio, al conceder un remedio

interdictal a favor de Caribe Rx respecto a los productos de GTI. Por consiguiente, tal y como dispone una mayoría de este Tribunal, corresponde modificar la orden de *injunction* con tal de eliminar la prohibición impuesta a las entidades Grifols respecto a la venta de productos de GTI. Asimismo, estimo adecuado el reiterar la procedencia de la prohibición de venta con relación a los productos de GBI, para los cuales Caribe Rx ostenta una relación de distribución exclusiva.

Anabelle Rodríguez Rodríguez
Juez Asociada