ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL III

| COSTA ESTE MEDICAL SERVICES, CORP.<br><br>Parte Recurrente<br><br>v.<br><br>DEPARTAMENTO DE SALUD, SECRETARIA AUXILIAR DE REGLAMENTACIÓN Y ACREDITACIÓN DE FACILIDADES DE SALUD<br><br>Parte Recurrida | KLRA202400601 | *Revisión Judicial,* procedente del Departamento de Salud, Secretaria Auxiliar para la Regulación de la Salud Pública, División de Vistas Administrativas<br><br>Querella Núm.: 23-03-010<br>Propuesta Núm.: 21-04-045<br><br>Sobre:<br>Querella contra la Resolución del Secretariado de Salud emitida en la Propuesta núm.: 21-04-045, sobre Solicitud de Certificado de necesidad y conveniencia para establecer un centro de diagnóstico y tratamiento en Canóvanas, Puerto Rico |

Panel integrado por su presidente, el Juez Figueroa Cabán, el Juez Salgado Schwarz y el Juez Monge Gómez.

Monge Gómez, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 4 de diciembre de 2024.

Compareció ante este Tribunal la parte recurrente, Costa Este Medical Services, Corp. (en adelante, "Costa Este" o "Recurrente"), mediante recurso de revisión judicial presentado el 23 de octubre de 2024. Nos solicitó la revocación de la *Resolución* emitida y notificada el 30 de agosto de 2024 por la División de Vistas Administrativas del Departamento de Salud (en adelante, "División de Vistas Administrativas"). Dicha determinación fue objeto de una "**Moción de Reconsideración**" interpuesta por Costa Este que fue denegada por el foro recurrido mediante *Notificación de Resolución* el 2 de octubre de 2024.

Por los fundamentos que expondremos a continuación, se *confirma* la *Resolución* recurrida.

**I.**

El 31 de octubre de 2021, Costa Este presentó una Solicitud de Certificado de Necesidad y Conveniencia (en adelante, "CNC") ante la Secretaría Auxiliar para Reglamentación y Acreditación de Facilidades de Salud (en adelante, "SARAFS"), ahora conocida como la Secretaría Auxiliar para la Regulación de la Salud Pública del Departamento de Salud (en adelante, "SARSP"). El propósito de la solicitud era para establecer un Centro de Diagnóstico y Tratamiento (en adelante, "CDT") a ubicarse en Km Hm 017 0, Carr. 185, Local 6A, 6B y 7A Urb. Rial Plaza en el Municipio de Canóvanas, Puerto Rico.

Luego, el 6 de diciembre de 2021, Canóvanas Medical Center, administrador del CDT municipal de Canóvanas (en adelante, "CMC"), presentó una misiva ante la SARAFS para oponerse a la solicitud de CNC. Alegó que no era viable tener tres (3) CDT dentro del mismo Municipio, con 0.3 millas de distancia entre ellos y considerando que su población no sobrepasaba de 50,000 habitantes. Específicamente, aludió a que en el proceso de evaluación de un CNC se debe tomar en cuenta la norma de que debe existir un CDT por cada 25,000 habitantes. Sostuvo, pues, que ante el decrecimiento de la población en el ayuntamiento y la existencia de dos (2) CDT, se debía denegar de plano la solicitud de Costa Este.

Luego de varios trámites impertinentes, el 28 de febrero de 2022, se celebró la vista pública sobre la solicitud del Recurrente. En la misma, Costa Este presentó como testigos a su presidenta corporativa, la Dra. Ismary González Artiles, y el Sr. Pedro Santiago Méndez, como perito economista. Así las cosas, el 9 de febrero de 2023, la Oficial Examinadora presentó un "**Informe de Oficial Examinadora**", mediante el cual recomendó denegar el CNC solicitado por Costa Este bajo el fundamento de que el Recurrente no cumplió con su obligación de demostrar de forma clara, razonable y mediante evidencia debidamente fundamentada que existiera la necesidad poblacional y demanda por los servicios en el área en donde se proponía establecer la facilidad médica.

A esos efectos, la SARAFS emitió *Resolución Final* el 15 de febrero de 2023, notificada el 17 de mismo mes y año, donde se acogió la recomendación incorporada en el "**Informe de la Oficial Examinadora**", por lo que se denegó la solicitud de CNC interpuesta por Costa Este. Insatisfecho con dicha determinación, Coste Este presentó una "**Querella**" en contra de la SARAFS ante la División de Vistas Administrativas, con el propósito de impugnar la *Resolución Final*. Tras un trámite procesal sobre una solicitud de anotación de rebeldía y una petición de desestimación por alegado incumplimiento con las disposiciones del Reglamento Núm. 9321 de 29 de octubre de 2021, conocido como el "Reglamento de Procedimiento Adjudicativos y de Reglamentación en el Departamento de Salud" (en adelante, "Reglamento Núm. 9321"), el 27 de junio de 2023, la SARAFS presentó "**Contestación a Querella**".

El 17 de noviembre de 2023, la SARAFS presentó una "**Solicitud de Resolución Sumaria**" en la que expresó que la prueba demostraba que no existía demanda de servicios que sobrepasara la oferta de servicios de salud que justificara la concesión del CNC presentado por Costa Este, de conformidad con el Reglamento Núm. 9084 de 17 de mayo de 2019 del Departamento de Salud, conocido como el "Reglamento del Secretario de Salud para Regir el Otorgamiento de Certificado de Necesidad y Conveniencia" (en adelante, "Reglamento Núm. 9084"). El 12 de diciembre de 2023, Costa Este presentó su "**Oposición a Solicitud de Sentencia Sumaria**". Mediante dicha oposición, sostuvo que existían hechos materiales en controversia que impedían la resolución sumaria de la "**Querella**".

Así las cosas, el 29 de agosto de 2024, el Oficial Examinador a cargo de la controversia sometió un "**Informe del Oficial Examinador**", mediante el cual recomendó que se declarara "No Ha Lugar" la "**Querella**" y se confirmara la *Resolución Final* que le denegó al Recurrente la solicitud del CNC. El 30 de agosto de 2024, la División de Vistas Administrativas emitió y notificó *Resolución* mediante la cual acogió la recomendación del Oficial Examinador.

Lo anterior tuvo el efecto de mantener inalterada la denegatoria del CNC solicitado por Costa Este.

En desacuerdo, el 18 de septiembre de 2024, Coste Este presentó "**Moción de Reconsideración**", la cual fue denegada por la División de Vistas Administrativas mediante *Notificación Resolución* de 2 de octubre de 2024. Aún inconforme con lo anteriormente resuelto, el Recurrente acudió ante este Tribunal mediante el recurso de epígrafe, en el que señaló los siguientes errores:

> **PRIMER ERROR:** ERRÓ EL DEPARTAMENTO DE SALUD AL DENEGAR LA CONCESIÓN DEL CERTIFICADO DE NECESIDAD Y CONVENIENCIA (CNC) A COSTA ESTE MEDICAL SERVICES CORP., AL INCURRIR EN MÚLTIPLES ERRORES DE HECHO Y DE DERECHO, EN VIOLACIÓN DE LOS CRITERIOS ESTABLECIDOS EN EL REGLAMENTO 9084.

> **SEGUNDO ERROR:** ERRÓ EL DEPARTAMENTO DE SALUD AL VIOLAR EL DERECHO FUNDAMENTAL AL DEBIDO PROCESO DE LEY DE COSTA ESTE MEDICAL SERVICES CORP., AL PRIVARLA DE SUS GARANTÍAS MÍNIMAS EN EL PROCEDIMIENTO ADJUDICATIVO, EN CLARA CONTRAVENCIÓN A LO DISPUESTO EN LA CONSTITUCIÓN DE PUERTO RICO, LA CONSTITUCIÓN DE LOS ESTADOS UNIDOS, LA LEY DE PROCEDIMIENTO ADMINISTRATIVO UNIFORME (LPAU) Y EL REGLAMENTO 9321.

> **TERCER ERROR:** ERRÓ EL DEPARTAMENTO DE SALUD AL EMITIR UNA RESOLUCIÓN SUMARIA EN VIOLACIÓN DE LOS PRINCIPIOS Y CRITERIOS ESTABLECIDOS EN LA LPAUG Y EL REGLAMENTO 9321, PRIVANDO A COSTA ESTE MEDICAL SERVICES CORP. DE UNA ADJUDICACIÓN JUSTA EN SU FONDO.

El 22 de noviembre de 2024, el Departamento de Salud presentó ante este Tribunal un "**Escrito en Oposición a Recurso de Revisión Judicial**".

Con el beneficio de la comparecencia de ambas partes, procedemos a resolver.

### II.

### A.

Es norma reiterada en nuestro ordenamiento jurídico que los tribunales apelativos están llamados a abstenerse de intervenir en las decisiones administrativas, ya que éstas poseen una presunción de legalidad y corrección. ECP Incorporated v. OCS, 205 DPR 268, 281 (2020); Torres

Rivera v. Policía de PR, 196 DPR 606, 626 (2016). Cónsono con ello, se ha resuelto que las decisiones de las agencias administrativas gozan de la mayor deferencia por los tribunales. Oficina de Ética Gubernamental v. Martínez Giraud, 210 DPR 79, 90 (2022). Ello debido a que dichos entes gubernamentales son los que poseen el conocimiento especializado y experiencia en los asuntos que les son encomendados. Super Asphalt v. AFI, 206 DPR 803, 819 (2021). En los casos de revisión judicial, "[e]l criterio a aplicarse no es si la decisión administrativa es la más razonable o la mejor al arbitrio del foro judicial; es, repetimos, si la determinación administrativa, en interpretación de los reglamentos y las leyes que le incumbe implementar, es una razonable". Rivera Concepción v. A.R.Pe, 152 DPR 116, 124 (2000).

La Sección 4.5 de la LPAU dispone que "[l]as determinaciones de hechos de las decisiones de las agencias serán sostenidas por el tribunal, si se basan en evidencia sustancial que obra en el expediente administrativo". 3 LPRA sec. 9675. Así pues, la intervención judicial en estos casos ha de centrarse en tres aspectos principales: (1) si el remedio concedido fue apropiado; (2) si las determinaciones de hechos están razonablemente sostenidas por la prueba y (3) si las conclusiones de derecho del organismo administrativo son correctas. PRTC Co. v. J. Reg. Tel. de PR, 151 DPR 269, 281 (2000). Podemos decir que la deferencia reconocida a la decisión de una agencia administrativa cede en las siguientes circunstancias: cuando no está basada en evidencia sustancial, cuando el organismo administrativo ha errado en la aplicación de la ley y cuando ha mediado una actuación irrazonable o ilegal. Hernández Feliciano v. Mun. de Quebradillas, 211 DPR 99, 115 (2023); T-JAC, Inc. v. Caguas Centrum Limited, 148 DPR 70, 80 (1999).

Las determinaciones de hechos de los organismos y agencias administrativas tienen a su favor una presunción de regularidad y corrección. Henríquez v. Consejo Educación Superior, 120 DPR 194, 210 (1987). De manera que los tribunales apelativos no intervienen con las determinaciones de hechos formuladas por una agencia administrativa si éstas están

sostenidas por evidencia sustancial que surja del expediente administrativo. Asoc. Vec. H. San Jorge v. U. Med. Corp., 150 DPR 70, 75 (2000).

Según lo ha definido el Tribunal Supremo en diversas ocasiones, evidencia sustancial es "aquella evidencia relevante que una mente razonable podría aceptar como adecuada para sostener una conclusión". Hilton Hotels v. Junta Salario Mínimo, 74 DPR 670, 687 (1953). Por ello, quien impugne las determinaciones de hechos de una agencia administrativa tiene el deber de presentar ante el foro judicial la evidencia necesaria que permita, como cuestión de derecho, descartar la presunción de corrección de la determinación administrativa. El peso de la prueba descansa entonces sobre la parte que impugna la determinación administrativa. Com. Vec. Pro-Mej., Inc. v. J.P., 147 DPR 750, 761 (1999). Además, debe demostrar que existe otra prueba en el expediente que reduzca o menoscabe el valor probatorio de la evidencia impugnada, hasta el punto de que no se pueda concluir que la determinación de la agencia fue razonable de acuerdo con la totalidad de la prueba que tuvo ante su consideración. Rebollo v. Yiyi Motors, 161 DPR 69, 76-77 (2002).

Las conclusiones de derecho, tal y como surge de la Sección 4.5 de la LPAU, *supra*, pueden ser revisadas en todos sus aspectos. 3 LPRA sec. 9675. Sin embargo, esto no significa que, al ejercer su función revisora, podamos descartar liberalmente las conclusiones e interpretaciones de la agencia, sustituyendo el criterio de ésta por el propio. Hernández Feliciano v. Mun. de Quebradillas, *supra*, págs. 115-116. "Al evaluar los casos es necesario distinguir entre cuestiones de interpretación estatutaria, en la que los tribunales son especialistas, y cuestiones propias para la discreción o pericia administrativa". Adorno Quiles v. Hernández, 126 DPR 191, 195 (1990).

El foro judicial podrá sustituir el criterio del organismo administrativo por el propio únicamente en aquellas ocasiones que no encuentre una base racional que fundamente la actuación administrativa. No obstante, es axioma judicial que, ante la prueba pericial y documental, el tribunal revisor se encuentra en igual posición que el foro recurrido y, por tanto, está facultado

para apreciar la prueba apoyándose en su propio criterio. Dye-Tex de P.R., Inc. v. Royal Ins. Co., 150 DPR 658, 662 (2000).

Sin embargo, la deferencia judicial en la revisión de determinaciones administrativas no conlleva la renuncia de este Tribunal a su función revisora. Simplemente, define el carácter limitado de la función revisora a casos apropiados. La deferencia reconocida no equivale a la dimisión de la función revisora de este foro apelativo intermedio en instancias adecuadas y meritorias, como resulta ser cuando la agencia ha errado en la aplicación de la ley. Reyes Salcedo v. Policía de P.R., 143 DPR 85, 94 (1987).

**B.**

La Sección 7 del Artículo II de la Constitución de Puerto Rico le asegura a todo ciudadano que no será privado de su propiedad o libertad, sin un debido proceso de ley. 1 LPRA Art. II, Sec. 7. Esta garantía proviene de las Enmiendas V y XIV de la Constitución de los Estados Unidos de América. La cláusula del debido proceso de ley en la jurisdicción federal tiene como fin ulterior evitar que el Gobierno utilice sus poderes como un instrumento de subyugación. Davidson v. Cannon, 474 US 344, 348 (1986). También se implantó para impedir que dichas facultades sean manejadas de manera arbitraria e irrazonable. Daniels v. Williams, 474 US 327, 331 (1986). Existen dos dimensiones de este principio cardinal: (1) la procesal y (2) la sustantiva. Rodríguez Rodríguez v. E.L.A., 130 DPR 562, 575 (1992).

Tanto en la jurisdicción local como en la federal, la vertiente sustantiva del debido proceso de ley se enfoca en proteger los derechos fundamentales de los individuos. *Véase*, Marina Ind., Inc. v. Brown Boveri Corp., 114 DPR 64, 81 (1983). Apoyado en lo anterior, se ha recalcado que el Estado no puede interferir con los intereses propietarios y libertarios de un individuo de manera irracional, injustificada o caprichosa. En su aspecto procesal, esta disposición le atribuye el deber al Estado de garantizarle a toda persona que en aquellas instancias en las que se pretenda intervenir con la libertad o propiedad de esta última, el proceso sea uno justo, equitativo e imparcial. López Vives v. Policía de Puerto Rico, 118 DPR 219, 231 (1987).

Para que surta efecto la protección que brinda este derecho constitucional en su ámbito procesal, tiene que estar en peligro un interés individual ya sea libertario o propietario. "Una vez cumplido este requisito, corresponde determinar cuál es el procedimiento exigido (what process is due)". Rodríguez Rodríguez v. E.L.A., *supra*, pág. 578. Dependiendo del contexto, "diversas situaciones pueden requerir diferentes tipos de procedimientos, pero siempre persiste el requisito general de que el proceso gubernamental sea justo e imparcial". Íd.

En armonía con lo anterior, en Mathews v. Eldridge, 424 US 319 (1976), el Tribunal Supremo de los Estados Unidos estableció los criterios que deben ser examinados a la hora de determinar el procedimiento adecuado para privarle a una persona de algún derecho de propiedad o libertad. Éstos son los siguientes: "(1) los intereses individuales afectados por la acción del gobierno; (2) el riesgo de una determinación errada que prive al individuo del interés protegido mediante el proceso utilizado y el valor probable de garantías adicionales o diferentes, y, (3) el interés gubernamental protegido con la acción sumaria y la viabilidad de usar métodos alternos". Rivera Rodríguez & Co. v. Lee Stowell, etc., 133 DPR 881, 888 (1993).

Desde esta perspectiva, el debido proceso de ley exige que en todo procedimiento adversativo se cumplan ciertas formalidades, a saber: (1) la notificación adecuada de la reclamación instada; (2) que el proceso se lleve a cabo ante un juzgador imparcial; (3) la oportunidad de ser oído; (4) el derecho a contrainterrogar testigos y examinar la evidencia presentada en su contra; (5) estar asistido por un abogado, y (6) que la decisión sea basada en el expediente. Íd., pág. 889. Ahora bien, aun cuando esta norma constitucional está cimentada en la protección de los derechos fundamentales que ostenta toda persona en nuestra jurisdicción, su aplicación responde a consideraciones prácticas y circunstanciales. Domínguez Talavera v. Tribunal Superior, 102 DPR 423, 428 (1974). De ahí que se disponga que el derecho a ser oído debe ser en un tiempo significativo y de una manera apropiada. Mathews v. Eldridge, *supra*, pág. 333.

**C.**

La Ley Núm. 38-2017, según enmendada, conocida como la "Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico", 3 LPRA sec. 9647 *et seq.* (en adelante, "LPAU"), tiene como objetivo proporcionar a la ciudadanía servicios públicos de calidad, eficiencia y prontitud, interpretándola y aplicándola de manera liberal para lograr estos propósitos, siempre protegiendo las garantías básicas del debido proceso de ley. En respuesta a ello, dicha ley habilita la disposición sumaria de las controversias bajo ciertas circunstancias. En específico, la Sección 3.7 de esta ley dispone lo siguiente:

> (b) **Si la agencia determina a solicitud de alguna de las partes y luego de analizar los documentos que acompañan la solicitud de orden o resolución sumaria** y los documentos incluidos con la moción en oposición, así como aquéllos que obren en el expediente de la agencia, **que no es necesario celebrar una vista adjudicativa, podrá dictar órdenes o resoluciones sumarias, ya sean de carácter final**, o parcial resolviendo cualquier controversia entre las partes, que sean separable de las controversias, excepto en aquellos casos donde la ley orgánica de la agencia disponga lo contrario. 3 LPRA sec. 9647 (énfasis suplido).

Asimismo, esta sección indica que la agencia administrativa no podrá emitir órdenes o resoluciones sumarias en situaciones donde: (1) hay controversia sobre hechos materiales o esenciales, (2) hay alegaciones afirmativas en la querella que no han sido rebatidas, (3) los documentos presentados muestran una controversia real sobre un hecho material y esencial o (4) como cuestión de derecho no procede. Íd.

En esa misma línea, la Regla 33 del Reglamento Núm. 9321, *supra*, dispone para la resolución sumaria de una querella ante la consideración del Departamento de Salud. Específicamente, provee lo siguiente:

1. Una vez concluido el término del descubrimiento de prueba, las partes pueden solicitar la resolución sumaria de la querella.

2. Presentada una solicitud de resolución sumaria, la parte contraria tendrá un término de quince (15) días, a partir de la fecha de la notificación de la moción, para presentar su oposición.

3. En el caso de una solicitud de resolución sumaria acompañada de una o más declaraciones juradas o

documentos fehacientes, la parte contraria deberá someter declaraciones juradas u otra evidencia documental fehaciente que establezca la existencia de una genuina controversia fáctica que deba dilucidarse en la vista en su fondo del caso. De no hacerlo se podrá disponer sumariamente del caso sin más citarle ni oírle.

4. Luego de analizar los documentos que acompañan la solicitud de orden o resolución sumaria y los documentos incluidos con la moción en oposición, así como aquellos que obren en el expediente de la agencia, sin que sea necesario celebrar una vista adjudicativa, el Oficial Examinador podrá dictar órdenes o resoluciones sumarias, ya sean de carácter final, o parcial resolviendo cualquier controversia entre las partes, incluyendo determinaciones de hechos y conclusiones de derecho.

5. El mecanismo de orden o resolución sumaria no estará disponible:
   a. Cuando se establezca la existencia de controversia real sobre los hechos pertinentes
   b. Haya alegaciones afirmativas en la querella que no hayan sido refutadas
   c. Cuando como cuestión de derecho no procede.
   d. En aquellos casos donde la ley orgánica de la agencia disponga lo contrario.

Es sabido que, por lo general, las Reglas de Procedimiento Civil no aplican automáticamente a los procedimientos administrativos. Pérez v. VPH Motors Corp., 152 DPR 475, 484 (2000). Sin embargo, nuestro Tribunal Supremo ha establecido que en casos apropiados se pueden adoptar normas de procedimiento civil para guiar el desarrollo del proceso administrativo, siempre que no sean incompatibles y contribuyan a una solución justa, rápida y económica de los casos. Íd. pág. 484. Tomando esto en consideración, y reconociendo que la LPAU contempla la resolución sumaria de controversias, se extiende la aplicación de las disposiciones de la Regla 36 de Procedimiento Civil a dichos casos sumarios. 32 LPRA Ap. V, R. 36.

En ese sentido, se considera un hecho material o esencial, "aquel que pueda afectar el resultado de la reclamación de acuerdo con el derecho sustantivo aplicable". Oriental Bank v. Caballero García, 212 DPR 671, 679 (2023). Cabe señalar que el juzgador no está limitado a los hechos o documentos que se produzcan en la solicitud, sino que puede tomar en consideración todos los documentos que obren en el expediente de la agencia. SLG Szendrey-Ramos v. Consejo Titulares, 184 DPR 133, 167 (2011). Así pues, se dispondrá del caso sumariamente cuando el Tribunal o

la agencia cuente con la verdad de todos los hechos necesarios para resolver la controversia y surja claramente que la parte promovida por el recurso no prevalecerá. Oriental Bank v. Caballero García, *supra*, pág. 678.

Por su parte, la parte que se opone a la resolución sumaria de una controversia debe identificar y rebatir los hechos fundamentales que considera están en disputa y que son relevantes para la causa de acción presentada por la parte que la promueve. Rosado Reyes v. Global Healthcare, 205 DPR 796, 808 (2020); Oriental Bank v. Perapi *et al*., 192 DPR 7, 25-26 (2014). Así, la parte que se opone a resolver la controversia de manera sumaria debe controvertir la prueba presentada y no cruzarse de brazos. ELA v. Cole, 164 DPR 608, 626 (2005). Esta no puede descansar en meras afirmaciones contenidas en sus alegaciones ni tomar una actitud pasiva, sino que está obligada a presentar contradeclaraciones juradas y/o contradocumentos que pongan en controversia los hechos presentados por el promovente. Oriental Bank v. Caballero García, *supra*, pág. 680; Roldán Flores v. M. Cuebas *et al*., 199 DPR 664, 677 (2018).

Según las directrices pautadas por nuestro más alto foro, una vez se presenta la solicitud de disposición sumaria y su oposición, el tribunal o la agencia deberá: (1) analizar todos los documentos incluidos en ambas mociones y aquellos que obren en el expediente; y (2) determinar si la parte opositora controvirtió algún hecho material o si hay alegaciones en la querella que no han sido refutadas en forma alguna por los documentos. Abrams Rivera v. ELA, DTOP y otros, 178 DPR 914, 932 (2010).

Al examinar la procedencia de una moción que solicita disponer de un caso sumariamente, el tribunal o la agencia no tiene que sopesar la evidencia y determinar la veracidad de la materia, sino que su función estriba en determinar la existencia o no de una controversia genuina, la cual amerite ser dilucidada en una vista. JADM v. Centro Comercial Plaza Carolina, 132 DPR 785, 802-803 (1983). Además de que "[t]oda inferencia razonable que se realice a base de los hechos y documentos presentados, en apoyo y en oposición a la solicitud de que se resuelva sumariamente, debe tomarse

desde el punto de vista más favorable al que se opone a ésta". ELA v. Cole, 164 DPR 608, 626 (2005).

En el caso de revisar la determinación del TPI o de una agencia administrativa respecto a una sentencia o resolución sumaria, este foro apelativo se encuentra en la misma posición que el foro de instancia o la agencia para evaluar su procedencia. Rivera Matos *et al.* v. Triple-S *et al.*, 204 DPR 1010, 1025 (2020); Meléndez González *et al.* v. M. Cuebas, 193 DPR 100, 118 (2015). La revisión que realice el foro apelativo deberá ser *de novo* y estará limitada a solamente adjudicar los documentos presentados en el foro apelado. Vera v. Bravo, 161 DPR 308, 335 (2004). De modo que las partes que recurren a un foro apelativo no pueden litigar asuntos que no fueron traídos a la atención del foro de instancia o la agencia. Íd. Además de esta limitación, se ha aclarado que al foro apelativo le está vedado adjudicar los hechos materiales esenciales en disputa, porque dicha tarea le corresponde al foro de primera instancia o a la agencia. Vera v. Dr. Bravo, *supra*, págs. 334-335.

En Meléndez González *et al.* v. M. Cuebas, *supra*, nuestro más Alto Foro delimitó los pasos del proceso a seguir para la revisión de la sentencia o resolución sumaria por parte de este foro revisor, el cual consiste de: (1) examinar de novo el expediente y aplicar los criterios que la Regla 36 de Procedimiento Civil, *supra*, y la jurisprudencia exigen; (2) revisar que tanto la moción de sentencia sumaria como su oposición cumplan con los requisitos de forma codificados en la referida Regla 36, *supra*; (3) revisar si en realidad existen hechos materiales en controversia y, de haberlos, cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil, 32 LPRA Ap. V, R. 36.4, de exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles son incontrovertibles; (4) y, de encontrar que los hechos materiales realmente son incontrovertidos, debe proceder a revisar *de novo* si el Tribunal de Primera Instancia o la agencia administrativa aplicó correctamente el derecho a la controversia. Íd., págs. 118-119.

**D.**

La Ley Núm. 2 de 7 de noviembre de 1975, según enmendada, conocida como "Ley de Certificados de Necesidad y Conveniencia", 24 LPRA sec. 334 *et. seq* (en adelante, "Ley Núm. 2"), fue promulgada "para autorizar al Secretario de Salud a expedir certificados de necesidad y conveniencia a toda persona que proyecte adquirir o construir una facilidad de salud u ofrecer o desarrollar un nuevo servicio de salud […]." El propósito de la citada ley es procurar la planificación ordenada de las facilidades y servicios de salud; y velar porque estos se presten en aquellos núcleos poblaciones donde sean necesarios. *Véase*, Exposición de Motivos, Ley Núm. 2, *supra*.

En lo aquí pertinente, el Artículo 1 de la Ley Núm. 2*,* en su inciso (e), establece que el CNC será el documento emitido por el Secretario de Salud para autorizar a una persona a llevar a cabo cualquier actividad cubierta por dicha ley y certificar que dicha actividad es necesaria para la población que será servida, lo cual no afectará indebidamente los servicios existentes. 24 LPRA sec. 334. De conformidad con dicha potestad, el Artículo 3 de dicha pieza legislativa dispone que el Secretario de Salud establecerá los criterios para expedir o denegar un CNC por medio de un reglamento. 24 LPRA sec. 334b. En vista de lo anterior, el Departamento de Salud promulgó el Reglamento Núm. 9084, *supra*.

En específico, el Artículo VI del Reglamento Núm. 9084, *supra,* establece los **criterios generales** que el Secretario de Salud deberá considerar para expedir un CNC. No obstante, el referido Artículo dispone que dicho funcionario mantendrá la discreción necesaria para sopesar y examinar dichos criterios. A esos fines, y en lo pertinente, el aludido Artículo delinea esos factores o criterios generales, a saber:

1. La relación entre la transacción para la cual se solicita el CNC y el plan de desarrollo servicios a largo plazo, si alguno, del Proponente.

2. La necesidad actual y proyectada que tiene la población a ser afectada por la transacción contemplada de los Servicios de Salud que se proveerán mediante la misma. La relación entre el sistema de salud operante en el área y la transacción propuesta.

3. La existencia de alternativas a la transacción para la cual se solicita el CNC o la posibilidad de proveer los Servicios de Salud contemplados de manera mas eficiente o menos costosa que la propuesta.

4. La relación entre el sistema de salud operante en el área y la transacción Propuesta.

[…]

6. La existencia de una demanda por los Servicios de Salud a ofrecerse, que sobrepase la oferta en una cantidad que sea suficiente para permitir la viabilidad de la Facilidad de Salud propuesta. Art. VI, Reglamento Núm. 9084, *supra*, pág. 13.

Por otro lado, el Artículo VIII del Reglamento Núm. 9084, *supra,* establece los **criterios específicos** que el Secretario de Salud debe considerar al evaluar la expedición del CNC, de acuerdo al tipo de facilidad de salud. Particularmente, el citado Artículo dispone lo siguiente:

Cuando una Solicitud de CNC compare favorablemente con todos los criterios aplicables, luego de la celebración de una Vista Publica, la Solicitud de CNC podrá ser aprobada y se otorgara el CNC solicitado. **Cuando no se cumpla con uno o más de los criterios aplicables, la Solicitud de CNC podría ser denegada**. El Proponente deberá presentar la información que se requiere en la Solicitud de CNC y tendrá el peso de proveer la evidencia necesaria para probar que cumple con los criterios generales y específicos aplicables a su caso. La responsabilidad primordial de producir la información necesaria para poder evaluar una Solicitud de CNC recae en el Proponente. Íd., Art. VIII, pág. 14 (énfasis suplido).

Además, el inciso 3 del aludido Artículo establece los criterios específicos atinentes a la evaluación de un CNC correspondientes a los CDT. Tales criterios son los siguientes:

(i) Todo Centro de Diagnóstico y Tratamiento deberá estar ubicado a una distancia en tiempo no mayor de treinta (30) minutos de un Hospital.

(ii) **Se establece la norma de un (1) Centro de Diagnóstico y Tratamiento por cada veinticinco mil (25,000) habitantes de un Municipio. No se podrá establecer más de un (1) Centro de Diagnóstico y Tratamiento en un Municipio con una población total menor de veinticinco mil (25,000) habitantes**.

(iii) Todo Centro de Diagnóstico y Tratamiento deberá garantizar la prestación de servicios de Radiología Diagnostica Convencional, Laboratorio Clínico y Farmacia durante su horario de operaciones completo.

(iv) Todo Centro de Diagnóstico y Tratamiento deberá ofrecer servicios de sala de emergencia en sus facilidades durante su horario de operaciones completo. Excepto que, en aquellos Municipios donde no se ubique un Hospital, los servicios de sala de emergencias deberán ofrecerse veinticuatro (24) horas al día.

(v) El Proponente deberá obligarse a que, de ser autorizado, prestará servicios a pacientes que participen del plan médico gubernamental existente. Íd., pág. 15 (énfasis suplido).

**III.**

Por estar íntimamente relacionados, procederemos a discutir conjuntamente los tres (3) errores planteados por el Recurrente.

En síntesis, Costa Este plantea que el Departamento de Salud incidió al denegar el CNC, el cual tenía el propósito de establecer un CDT en el Municipio de Canóvanas, violentando así los criterios requeridos por el Reglamento Núm. 9084, *supra*. Lo anterior, fundamentado en que presentó evidencia suficiente para que el Departamento de Salud procediera a conceder dicho permiso. Además, sostiene que se le violó su debido proceso de ley, pues no se le permitió presentar prueba, se ignoraron los méritos de su evidencia y se aprobó la intervención de un tercero. Finalmente, alega que el Departamento de Salud incidió al resolver de manera sumaria la "**Querella**", pues existía controversias medulares de hechos que no permitían al foro administrativo disponer del caso. No tiene razón. Veamos.

Conforme hemos citado, las Reglas de Procedimiento Civil no aplican automáticamente a los procedimientos administrativos, pero pueden ser utilizadas en casos adecuados para ayudar a una resolución justa y eficiente de los casos. Pérez v. VPH Motors Corp., *supra,* pág. 484. Debido a que la LPAU, *supra*, incorpora la resolución sumaria de controversias, las disposiciones de la Regla 36 de Procedimiento Civil se aplican también a estos casos. 32 LPRA Ap. V. R. 36. Además, la Regla 33 del Reglamento Núm. 9321, *supra,* autoriza resolver una querella presentada ante el Departamento de Salud de manera sumaria. Así pues, procede resolver una disputa sumariamente si conforme a la evidencia presentada, no existe controversia real y sustancial en cuanto a algún hecho esencial y pertinente

del caso. 32 LPRA Ap. V., R. 36. Un hecho material es aquel que tiene el potencial de impactar el resultado de la reclamación. Oriental Bank v. Caballero García, *supra*, pág. 7. Para ello, el Tribunal debe tener a su disposición todos los hechos necesarios para resolver la controversia. Íd. Esto es, que estamos impedidos de disponer de un caso por la vía sumaria cuando existan hechos fundamentales controvertidos. SLG Szendrey-Ramos v. Consejo de Titulares, *supra*, pág. 168.

Tras un minucioso análisis de los documentos que obran en el expediente, constatamos la ausencia de controversia sobre hechos materiales o sustanciales que impidan resolver el caso, sin la celebración de una vista adjudicativa. Por tanto, a base del análisis *de novo* que venimos compelidos a efectuar, en lo aquí pertinente, acogemos como nuestros algunos de los hechos incontrovertidos y medulares por la Oficial Examinadora, los cuales desglosamos a continuación:

1. El 31 de octubre de 2021, Costa Este Medical Services, Corp., presentó ante la SARAFS una Solicitud de CNC para establecer una facilidad centro de CDT que operará con el nombre comercial de CDT Costa Este Plaza Rial.

2. El proyecto propuesto estaría ubicado en Km Hm 017 0, Carr. 185, Local 6A, 6B y 7A, Urb. Rial Plaza en el Municipio de Canóvanas.

3. Costa Este presentó el testimonio del perito, Sr. Pedro J. Santiago, quien estuvo a cargo de la preparación de un estudio de viabilidad en apoyo a la propuesta sometida para la operación de un CDT.

4. Surge del análisis del propio perito que la instalación propuesta estaría localizada dentro de un área de servicio definida por los límites geográficos del Municipio de Canóvanas, cuya población en el año 2021 se estimó en 41,840 habitantes.

5. Surge del análisis de la viabilidad económica y de mercado que en el Municipio de Canóvanas existe solo una facilidad de CDT operado, la cual se conoce como CDT del Municipio de Canóvanas.

6. El Recurrente explicó que su CDT estará a menos de 30 minutos de hospitales en el aledaño Municipio de Carolina, tales como el Hospital de la UPR Dr. Federico Trilla y el Doctors' Center Hospital, además de hospitales en Fajardo.

7. Por otra parte, Canóvanas Medical Center, CSP., entidad que administra el CDT del Municipio de Canóvanas, presentó oposición a la propuesta para establecer CDT Costa Este Plaza Rial.

8. La oposición de Canóvanas Medical Center, CSP., consistió en la presentación de una carta de oposición que contenía alegaciones sobre que el CNC propuesto no cumplía con el criterio de cabida, que el Municipio de Canóvanas ya contaba con dos facilidades de CDT, y por lo tanto, no había espacio para el establecimiento de otra facilidad.

9. Canóvanas Medical Center, CSP. indicó que hay 41,680 habitantes en el Municipio de Canóvanas, por lo que no se cumple con el criterio de un CDT por cada 25,000 habitantes.

Conforme hemos citado, el Reglamento Núm. 9084, *supra*, aplica en los procesos ante el Departamento de Salud que estén relacionados al otorgamiento de un CNC. En particular, dicho Reglamento dispone de unos criterios generales y unos criterios específicos que el Secretario de Salud considerará al evaluar una solicitud de CNC. En cuanto a los criterios específicos, detallamos que éstos deben cumplirse en su totalidad o, en ausencia de alguno, el aludido cuerpo reglamentario le confiere al Secretario de Salud la discreción de denegar la solicitud de un CNC. Atinente a la controversia que nos ocupa, el citado Reglamento requiere, entre otros criterios, que existan 25,000 habitantes por cada CDT en el Municipio en cuestión. En otras palabras, no se podrá establecer más de un CDT en un Municipio con una población menor a 25,000 habitantes.

Considerando lo anterior, en el caso de autos, el Municipio de Canóvanas debe tener como mínimo 50,000 habitantes para que se permitan dos (2) CDT en la misma área geográfica. Sin embargo, surge de la prueba presentada por el propio Recurrente durante la Vista Pública celebrada que la población del Municipio de Canóvanas para el año 2021 era de 41,840 habitantes. Específicamente, el señor Santiago Méndez, perito presentado por Costa Este, testificó lo siguiente:

En términos de cabida reglamentaria, ahora estoy en la página 13 del estudio, para el año que se preparó este trabajo en 2021, final de 2021, la población de Canóvanas era de 41,840 personas, que a 25,000 personas por labora…por CDT, tenemos términos absolutos, si dividimos un número por el otro, va a dar 1.67, ¿verdad? No podemos tener .67 CDTs. Así que, en términos absolutos, pues nos vamos y redondeamos hacia arriba y aquí cabe otro CDT, no solamente porque la población está en Canóvanass [sic] envejeciendo y cada año va a necesitar mayor cantidad de servicios, pero también, como había dicho, hay un potencial de una población flotante muy alta

entre la PR-3 y la PR-66 que muy bien también se podría añadir a la demanda que puede ser captada por el proponente.[1]

De la misma manera, CMC durante su ponencia en la Vista Pública expresó lo siguiente:

> Nosotros lo que le estamos planteando a la oficial examinadora es que, conforme a la reglamentación, no podría haber otro CDT por no haber la población que se requiere. Inclusive, el propio perito, quien ha manifestado que la población son [sic] de 41,680 habitantes y de acuerdo, que podemos tomar todos conocimiento, que la población de todas estas áreas, por todas las razones que están ocurriendo actualmente, ha ido mermando. ¿Por qué? Porque van abandonando al país, se mudan y ha ido mermando. Y de lo que tenemos y que hemos sometido, la población de Canóvanas ha ido mermando paulatinamente.[2]

Dado lo anterior, nos resulta claro que aquí no se cumplió con el requisito poblacional que dispone el Reglamento Núm. 9084, *supra*. Además, puntualizamos que, aunque el Secretario de Salud cuenta con la discreción para denegar o conceder un CNC, ésta no es ilimitada y debe estar enmarcada en los criterios establecidos en la ley, el reglamento aplicable y su política pública. Sobre este último particular, debemos enfatizar también que coincidimos con el análisis legal efectuado por el Oficial Examinador e incorporado en su *Informe*, a los efectos de que las únicas facilidades de salud en las que el Reglamento Núm. 9084, *supra*, requiere que se tome en consideración la población flotante y residente son los laboratorios clínicos y centros de radiología convencional.

Por tanto, el argumento esgrimido por Costa Este relacionado a que se descartó el testimonio de su perito carece de méritos, toda vez que indistinto de cuál fuera su análisis, el cálculo de población flotante para propósitos de la adjudicación sobre la procedencia del CNC en controversia era inmaterial e impertinente. Esto, pues la población residente era la verdaderamente pertinente al asunto. Así, de conformidad con dicho criterio poblacional, se necesitarían 50,000 habitantes para que el CDT propuesto tuviera cabida en el Municipio de Canóvanas. El Reglamento Núm. 9084, *supra*, limita el mismo a un cálculo matemático específico de 25,000 habitantes por cada CDT. De

---

[1] *Véase*, Apéndice del Recurso, anejo 90, págs. 499-500.
[2] *Véase*, Apéndice del Recurso, anejo 90, págs. 526-527.

ahí que se haya determinado que existía una diferencia entre los 50,000 habitantes para el CDT existente y el propuesto y la población del ayuntamiento ascendente a poco más de 8,000 personas.

Así que, a la luz de las normas sustantivas y procesales aplicables al caso de autos, concluimos que el foro recurrido no erró al disponer del asunto sumariamente. Nunca existió controversia sobre el hecho medular de la cantidad poblacional del Municipio de Canóvanas al momento del análisis efectuado sobre la procedencia del CNC que pudiera haber limitado la disposición sumaria de la "**Querella**". Lo anterior, claramente, implica que la celebración de una vista adjudicativa era innecesaria para resolver el asunto que tuvo ante sí la agencia. La existencia del mecanismo de adjudicación sumaria de forma alguna se puede interpretar como una afrenta al derecho a un debido proceso de ley como infiere Costa Este.

Por otro lado, en lo concerniente al argumento esgrimido por el Recurrente sobre la consideración de la misiva suscrita por la Alcaldesa del Municipio, también carece de méritos. Un análisis de la Resolución recurrida revela que el Departamento de Salud no utilizó la misma para arribar a sus conclusiones y tampoco fue determinante en su determinación. Por tanto, coincidimos con la Recurrida, a los efectos de que la presentación de dicha carta fue inmaterial para la denegatoria del CNC. Reiteramos, la determinación del Departamento de Salud se basó en que en el área de servicios no sostenía un CDT adicional. A lo anterior, se le suma el hecho de que el Recurrente no probó la presunta demanda de servicios insatisfecha, más aun con la proyección existente sobre una disminución poblacional.

En suma, concluimos expresamente que el Recurrente no aportó evidencia suficiente para derrotar la presunción de corrección de la cual están investidas las decisiones del foro administrativo. En el ejercicio de nuestra función revisora, venimos compelidos a darle deferencia a la especialización, experiencia y las cuestiones propias de la discreción o pericia de las agencias administrativas. Tal y como hemos adelantado, somos de la opinión de que la

agencia recurrida no actuó de manera arbitraria, ilegal, irrazonable o fuera del marco de los poderes que se le delegaron.

Siendo así, sostenemos que no se cometieron los señalamientos de error planteados.

**IV.**

Por los fundamentos que anteceden, los cuales hacemos formar parte de la presente *Sentencia*, se *confirma* la *Resolución* recurrida.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones